1                    UNITED STATES BANKRUPTCY COURT

                     SOUTHERN DISTRICT OF FLORIDA

2

                     Judge Laurel Myerson Isicoff

3

4    IN RE:

5    CAPITOL INVESTMENTS USA,    CASE NO: 09-36408-BKC-LMI
     INC.,

6                    Debtor.
     _____ /

7

     NEVIN KAREY SHAPIRO,        CASE NO: 09-36418-BKC-LMI

8                    Debtor.
     _____ /

9

10        MOTION TO APPOINT TRUSTEE (4), MOTION TO

          JOINTLY ADMINISTER CASE(S) 09-36418 INTO

11               LEAD CASE 09-36408 (6).

12

13                   DECEMBER 10, 2009

14

15        The above-entitled cause came on for hearing

16   before the HONORABLE LAUREL MYERSON ISICOFF, one of

17   the Judges in the UNITED STATES BANKRUPTCY COURT,

18   in and for the SOUTHERN DISTRICT OF FLORIDA AT LARGE,

19   at 51 SW 1st Avenue, Miami, Dade County, Florida,

20   commencing at or about 4:00 p.m., on December 10th,

21   2009, and the following proceedings were had:

22

23

24

25                   Reported by: Carmen E. De La Cruz

Page 2

1    APPEARANCES:

2

3    KOZYAK TROPIN & THROCKMORTON

4    BY: DAVID ROSENDORF, Esq.

5    On behalf of the Petitioning Creditors.

6

7    SILVIO AMICO, Esq.

8    On behalf of Capitol Investments.

9

10   DAMIAN & VALORI

11   BY: PETER VALORI, Esq.

12   On behalf of Nevin Shapiro.

13

14   GRAY ROBINSON

15   BY: FRANK TERZO, Esq.

16   On behalf of David Birnbaum Family Trust.

17

18

19                    EXHIBITS                    PAGE

20   Petitioning Creditors:

21   Exhibit Nos. 1 through 13                     20

22

23

24

25

1           THE COURT:  We're here on Capitol

2  Investments USA and Nevin Shapiro; correct?

3           MR. ROSENDORF:  Correct, Your Honor.

4           THE COURT:  And I'll take appearances

5  starting with you, Mr. Rosendorf, since you have the

6  podium.

7           MR. ROSENDORF:  Thank you, Your Honor.

8  David Rosendorf, Kozyak Tropin & Throckmorton,

9  representing the petitioning creditors, South Beach

10  Chicago, LLC, South Beach Chicago 2008, LLC, Bradley

11  Associates Limited Partnership and Relianz Mortgage,

12  Inc. and Victor Gonzalez.

13           THE COURT:  Okay.  Good afternoon.

14           MR. VALORI:  Peter Valori on behalf of

15  Nevin Shapiro.

16           THE COURT:  Good afternoon.

17           MR. VALORI:  Good afternoon, Your Honor.

18           MR. AMICO:  Your Honor, Silvio Amico, on

19  behalf of Capitol Investments USA, Inc.

20           MR. TERZO:  Good afternoon, Your Honor.

21  Frank Terzo with the firm of Gray Robinson.  I'm here

22  representing the David Birnbaum Family Trust out of

23  Westchester, New York.  We are not one of the

24  petitioning creditors, we just found out about the

25  bankruptcy and we're here to see what goes on.

1          THE COURT:  Okay.  Anyone else wish to

2    make an appearance?  No.

3          All right.  Mr. Rosendorf, I've read the

4    pleadings that were filed in both 09-36408 and

5    09-36418, I believe is the other number.

6          MR. ROSENDORF:  Correct, Your Honor.

7          THE COURT:  All right.  So how would you

8    like to proceed?

9          MR. ROSENDORF:  Fortunately, it is going

10   to be much easier than I had anticipated, Your Honor.

11   There are two motions on your calendar in each of the

12   cases.

13         THE COURT:  Uh-huh.

14         MR. ROSENDORF:  The motion for appointment

15   of an interim trustee and a motion for joint

16   administration.  As we were arriving in court, I

17   learned that an appearance was filed on behalf of

18   Mr. Shapiro and subsequently on behalf of Capitol, the

19   company entity.

20         I have been advised by counsel for both

21   Mr. Shapiro and for Capitol that they will not be

22   opposing either the motion for appointment of an

23   interim trustee or the motion for joint

24   administration.

25         THE COURT:  Okay.

1          MR. ROSENDORF:  And so, unless the Court

2    would like a proffer, which I would be happy to do, we

3    would request that that lack of opposition be

4    confirmed, and we would submit to the Court an order

5    directing the appointment of an interim trustee.

6          If the Court would like, I would obviously

7    be perfectly happy to give you a proffer or to put on

8    evidence as to what we would intend to show to support

9    the appointment of an interim trustee in each of these

10   cases.

11         THE COURT:  Okay.  Well, let's stop for a

12   moment.  With respect to -- I'll ask first Mr. Valori

13   and then Mr. Amico this question.  So, Mr. Valori,

14   with respect to your client there would be particular

15   findings that the Court would need to make pursuant to

16   303(g) regarding the appropriateness of appointing a

17   trustee.  Are you conceding that the grounds exist to

18   appoint an interim trustee?

19         MR. VALORI:  Well, Your Honor, I have just

20   been retained on this case and I have not had

21   sufficient time to confer with my client concerning

22   the grounds for the motion or the underlying facts of

23   this case.

24         THE COURT:  Uh-huh.

25         MR. VALORI:  I've come here today with an

1   inability to oppose the motion that's being made, and

2   I advised counsel for the petitioning creditors of

3   same.  Where that leaves us as far as the facts and

4   findings that Your Honor may have to make, I'm not

5   sure.  I can only state that I am -- I do not have

6   evidence and I'm not prepared today to proceed and

7   oppose the motion that's been filed.

8            THE COURT:  All right.  So then, just so

9   that the record is clear and perhaps Mr. Rosendorf

10  understood, it is not that you are consenting to

11  appointment of a trustee -- an interim trustee, it's

12  that you are not in a position to oppose it?

13           MR. VALORI:  That's exactly right,

14  Your Honor.

15           THE COURT:  Okay.  Thank you, Mr. Valori.

16  Okay.  Mr. Amico?

17           MR. AMICO:  Your Honor, our position is

18  much the same.  I was brought in this afternoon.

19  We're not opposed to this in the sense that we just

20  don't have any argument against it.

21           THE COURT:  No argument against it,

22  period, or no argument to which you are prepared to

23  put on a case today?

24           MR. AMICO:  To which we're prepared to put

25  on today.

```
 1                THE COURT:  Okay.  All right.  Thank you.

 2    All right.  Mr. Rosendorf, there's your answer, make

 3    your proffer.  Before I ask you to make the proffer

 4    though, I'm going to ask Mr. Valori and Mr. Amico

 5    this:  I am inviting Mr. Rosendorf to make a factual

 6    proffer.  I'm going to ask Mr. Rosendorf who he would

 7    identify as his witnesses were he to put them on the

 8    stand.  So I'll need to know if you gentlemen consent

 9    to the factual proffer or you prefer that

10    Mr. Rosendorf put on his evidence through witnesses.

11    So, I'll start with you, Mr. Valori?

12                MR. VALORI:  I would consent to the

13    proffer, Your Honor.  I don't think he needs to put on

14    witnesses here today, because I could not

15    cross-examine them for the reasons I previously

16    stated.

17                THE COURT:  Okay.  Mr. Amico?

18                MR. AMICO:  Your Honor, I agree as well.

19                THE COURT:  Okay.  Then you may proceed

20    with your proffer, Mr. Rosendorf.

21                MR. ROSENDORF:  Thank you, Your Honor.

22                THE COURT:  Make sure your factual record

23    identifies who would be making the statements if they

24    were sworn in to testify.

25                MR. ROSENDORF:  I will, Your Honor, and
```

1  thank you, counsel, as well.  Your Honor, I can hand

2  up to the Court and I will provide the counsel as well

3  a set of exhibits that we have prepared for purposes

4  of this hearing.  May I approach?

5          THE COURT:  Yes, please.  Thank you.

6          MR. ROSENDORF:  Your Honor, we have two

7  witnesses here and present in court, Sherwin Jarol who

8  is the principal of -- general partner of Bradley

9  Associates, Relianz Mortgage, South Beach Chicago and

10  South Beach Chicago 2008, as well as Mr. Gonzalez who

11  is here as well, Your Honor.

12          THE COURT:  Okay.

13          MR. ROSENDORF:  The proffer that I would

14  make to this Court is that Mr. Jarol is the principal

15  or rather the general partner of each of the

16  petitioning creditors, other than Mr. Gonzalez; that

17  in that capacity, he would testify that each of those

18  entities entered into loan transactions with Capitol

19  Associates as are reflected in the exhibits, which are

20  in this exhibit register.  Exhibit 1 is a loan between

21  Capitol and Bradley for $26 million which was a

22  revolving loan.  Exhibit Number 2 is a loan -- and

23  each of these include a loan agreement, promissory

24  note and guaranty.

25          THE COURT:  Okay.  So they're

1    documentations relating to the loans; correct?

2              MR. ROSENDORF:  Correct.

3              THE COURT:  Okay.

4              MR. ROSENDORF:  And each of these were --

5    the loans were made, the borrower was Capitol and the

6    loans were guaranteed by Mr. Shapiro individually.  In

7    some instances, he may have also signed as co-maker of

8    the loan.

9              THE COURT:  Okay.  And if Mr. Jarol were

10   on the stand, he would identify each of these

11   documents?

12             MR. ROSENDORF:  He would identify and

13   authenticate each of these documents and indicate that

14   the funds, in fact, were advanced by each of these

15   entities.

16             THE COURT:  And which exhibits are those?

17             MR. ROSENDORF:  Those are Exhibits 1, 2,

18   3, 4 and 5.

19             THE COURT:  Okay.  Continue.

20             MR. ROSENDORF:  Mr. Jarol would testify

21   that these loans were made in connection with what

22   were represented to be a transaction that will be very

23   familiar to this Court, and will probably induce a

24   sense of dejavu, it's represented to be a food

25   diverting transaction whereby food products were

1   brought in one part of the country, pre-sold to a

2   buyer in another part of the country at a profit.

3   The funds were ostensibly to be used to finance the

4   transaction and to be repaid upon the conclusion of

5   the transaction, usually on short-term terms of

6   approximately 40 days, and for a long period of time

7   these transactions paid interest as provided for under

8   the loan agreements with respect to these entities,

9   certain of them stopped receiving payment at the

10  beginning of 2009.

11            THE COURT:  Uh-huh.

12            MR. ROSENDORF:  That would be Relianz and

13  Bradley.  Interest payments continued to be made to

14  South Beach Chicago.  Mr. Jarol would proffer on -- I

15  proffer on his behalf that a number of excuses and

16  explanations were made as to as to why payments were

17  not forthcoming, but ultimately they were not made.

18            The South Beach Chicago loan for

19  $2 million matured in October of 2009.  Payment was

20  not made when that loan matured.  A number of

21  representations were made by Mr. Shapiro to Mr. Jarol

22  that funds were forthcoming, that funds were to be

23  delivered.  He authorized those representations to be

24  repeated to investors in the South Beach Chicago fund

25  and ultimately no funds materialized.

```
 1              THE COURT:  Uh-huh.

 2              MR. ROSENDORF:  South Beach Chicago filed

 3    suit in November.  A copy of that complaint is

 4    identified in the exhibit register as Exhibit 10.

 5              THE COURT:  Okay.

 6              MR. ROSENDORF:  A number of

 7    representations were made to Mr. Jarol by

 8    Mr. Shapiro during the time period that payments were

 9    not being made.  He was told that --

10              THE COURT:  Who is he?

11              MR. ROSENDORF:  Mr. Jarol was told by

12    Mr. Shapiro that he would be repaid.  He was told that

13    Mr. Shapiro was attempting to refinance the business.

14    He was told that the company ran into troubles in

15    October 2008 when a number of investors made

16    redemptions and that he had to pay $13 million in

17    redemption for people that wanted to take out money.

18              He was told as well, that is, Mr. Jarol

19    was told by Mr. Shapiro that if he was sued, either

20    Capitol or Mr. Shapiro, that nobody would get

21    anything.  That he would just file bankruptcy.

22              Mr. Jarol was told by Mr. Shapiro in early

23    2009, that he had paid, that is, Mr. Shapiro had paid

24    a million dollars to attorney Guy Lewis to do a fraud

25    audit and that he would meet with them.  That meeting
```

1   did not happen.  Mr. Jarol tried to get access to

2   books and records to determine what was going on and

3   to find out.  He was refused by

4   Mr. Shapiro.  Some time in approximately March or

5   April of 2009, Mr. Shapiro showed Mr. Jarol a hundred

6   thousand square foot warehouse which was ostensibly

7   going to be used to hold inventory which was going to

8   be consolidated in that location, but the warehouse

9   was empty at that time.

10          Your Honor, with respect to Mr. Gonzalez,

11  Mr. Gonzalez would testify that he has provided money

12  to Capitol and to Mr. Shapiro through loans or joint

13  venture agreements, again, for food brokering business

14  transactions which were typically to be repaid with

15  interest within a time period of not more than 40

16  days.  Those transaction were documented by notes and

17  joint venture agreements.

18          Exhibit 6 in the exhibit register are

19  examples of notes, promissory notes and joint venture

20  agreements entered into between Capitol,

21  Mr. Shapiro and Mr. Gonzalez.  For a time Capitol and

22  Shapiro honored their payment obligations under those

23  agreements, but at a certain period of time they

24  stopped making payments.  They -- after they had

25  ceased making payments, the parties negotiated a

1    confidential settlement agreement which was signed and

2    executed on June 10th, 2009.

3              THE COURT:  Okay.  I'm going to stop you

4    for a moment just so the record is clear.  Are you

5    talking about both Jarol and Gonzalez now or are you

6    strictly speaking about Gonzalez?

7              MR. ROSENDORF:  This is strictly with

8    respect to Mr. Gonzalez.

9              THE COURT:  Okay.  Just to make it clear.

10             MR. ROSENDORF:  Solely with respect to

11   Mr. Gonzalez.

12             THE COURT:  Okay.  So with respect to

13   Mr. Gonzalez, for a time Capitol and Shapiro honored

14   the agreements, and then they entered into a

15   confidential settlement agreement.

16             MR. ROSENDORF:  Correct.

17             THE COURT:  Okay.

18             MR. ROSENDORF:  At the time of the

19   settlement agreement Mr. Gonzalez was owed in excess

20   of five and a half million dollars.  The settlement

21   agreement provided for Capitol and Mr. Shapiro to

22   repay $3.5 million over time in payment increments of

23   $500,000 each starting on June 30th, 2009.  If he

24   defaulted, that is, if Capitol and Mr. Shapiro

25   defaulted on the payment obligations, they would

1    become responsible for the original amount of the

2    debt, which was $5,677,903.

3              The payment was not made on June 30th.

4    Capitol and Shapiro defaulted on their obligations

5    under the settlement agreement, and on November 6th

6    Mr. Gonzalez filed suit for breach of the settlement

7    agreement.  A copy of that complaint is in the exhibit

8    register as Exhibit Number 9.

9              THE COURT:  Okay.

10             MR. ROSENDORF:  He likewise has not been

11   paid.

12             THE COURT:  He meaning Mr. Gonzalez?

13             MR. ROSENDORF:  Mr. Gonzalez.

14   Mr. Gonzalez, similar to Mr. Shapiro, has been told a

15   number of -- I'm sorry, similar to Mr. Jarol, has been

16   told a number of things by Mr. Shapiro.  He's been

17   repeatedly reassured that he would be paid.

18   Mr. Gonzalez has likewise been told by Mr. Shapiro

19   that he had paid a big retainer to a lawyer, that

20   nobody would get service on him if they attempted to

21   sue him, that nobody would collect anything if they

22   attempted to sue and that his attorney could stall a

23   judgment for three or even six years.

24             Mr. Gonzalez was told by Mr. Shapiro that

25   his assets were so well hidden, that the best asset

1    locator wouldn't be able to find him, and was told

2    later in June of this year, that he had hired a new

3    lawyer who he had paid to shelter Mr. Shapiro's

4    assets.  He was told --

5            THE COURT:  Who is he?

6            MR. ROSENDORF:  Mr. Gonzalez was told in

7    discussing the prospect of refinancing Capitol's

8    obligations, that Capitol could not do so because

9    turning the books over to the bank would be bank

10   fraud.  He was given access, at certain points before

11   the confidential settlement agreement was reached, to

12   some of the books and records of the company.  At one

13   point he obtained a copy of a balance sheet of Capitol

14   Investments --

15           THE COURT:  Again, just to make sure --

16           MR. ROSENDORF:  Mr. Gonzalez.

17           THE COURT:  Okay.

18           MR. ROSENDORF:  Mr. Gonzalez received a

19   copy of a balance sheet of Capitol Investments.  That

20   balance sheet is identified as Exhibit 12 in the

21   exhibit register.

22           THE COURT:  Okay.

23           MR. ROSENDORF:  And that balance sheet, if

24   you take a look at it, which is dated as of February

25   12th, 2009, shows total negative equity of

1    $110 million.

2         In addition to the foregoing, Your Honor,

3    I just excused from appearing the process server who

4    we had engaged to attempt service, personal service,

5    of the involuntary petition, petitions, against

6    Capitol Investments and Mr. Shapiro individually.  I

7    would proffer that that process server attempted

8    service at the residence address of Mr. Shapiro and

9    was told there that Mr. Shapiro was not present, that

10   there were -- the people who were there had rented the

11   property and that Mr. Shapiro was no longer there.

12        At the business address, the process

13   server attempted service and there was nobody there at

14   the business.  There is a photograph which is Exhibit

15   13 in the exhibit register taken by the process server

16   with a UPS notice indicating that they had attempted

17   delivery and it was not able to make it.  There is

18   every indication that we have received that the

19   business premises have been vacated and that the

20   residence has been vacated as well.

21        I should have added to the proffer of both

22   Mr. Jarol and Mr. Gonzalez that they have recently

23   attempted to communicate with Mr. Shapiro and that

24   neither of them have received any response or

25   communication from Mr. Shapiro since December 1st.

1          THE COURT:  Okay.  So in other words, what

2   you're saying is that Shapiro is AWOL?

3          MR. ROSENDORF:  Correct.

4          THE COURT:  Are there any other employees

5   for Capitol Investments other than Mr. Shapiro?

6          MR. ROSENDORF:  There are none that we

7   know of.

8          THE COURT:  Okay.

9          MR. ROSENDORF:  I have been advised -- I

10  want to correct my last statement, Your Honor.  I have

11  been advised by the client that there were two

12  accountants that worked for the business that they had

13  communicated with, that they have not communicated

14  with since November 2009.

15         THE COURT:  All right.  Two accountants.

16         MR. ROSENDORF:  Correct.

17         THE COURT:  Uh-huh.  All right.  Anything

18  else that you would like to put on with respect to

19  your proffer regarding the showing that you need to

20  make under 303(g) which is that the appointment is

21  necessary to preserve the property of the estate or

22  to prevent loss of the estate?

23         MR. ROSENDORF:  Your Honor, nothing

24  further in the way of proffer.  By way of very brief

25  argument, I think that you have a very good sense, I

1  would suspect, of where these facts lead us to have

2  concern.  There is every indicia from the information

3  that we have been told at a minimum that this is a

4  debtor, both Mr. Shapiro individually as co-maker or

5  guarantor of the obligations of Capitol and Capitol

6  itself, that it is not paying its debts as they come

7  due.

8           Aside from the proffer of the witness that

9  I have available, Your Honor, we have certified copies

10  of complaints and judgments that have been entered

11  against Mr. Shapiro and Capitol.  There is, let me

12  match these up to the exhibit register, Exhibit Number

13  7 is a complaint filed by City National Bank as

14  trustee against Capitol Investments.

15           THE COURT:  Uh-huh.

16           MR. ROSENDORF:  Based upon a note, and the

17  notes in the amount of $250,000 and $127,500.

18           THE COURT:  Uh-huh.

19           MR. ROSENDORF:  Exhibit 8 is an affidavit

20  submitted by David Rowe in an action that he has filed

21  in Miami Dade County Circuit Court attesting that he

22  is owed $500,000 plus interest.

23           Exhibit 11 is a final judgment in favor of

24  Terrance Smith entered in the Miami Dade Circuit Court

25  for an amount in excess of $4 million against Capitol

1   Investments and Nevin Shapiro based upon a default

2   under a confidential general release and settlement

3   agreement.  That judgment was entered November 5,

4   2009.

5            We have certified copies of each of those

6   here and would be prepared to present them to the

7   Court if we were going forward with an evidentiary

8   presentation.

9            THE COURT:  Well, you are going forward

10  with an evidentiary presentation.  So let me

11  summarize, although I don't -- if you're going to give

12  me the originals, if Mr. Amico or Mr. Valori would

13  like those as part of the evidence as opposed to the

14  copies which do show that they are copies of certified

15  originals, then we'll substitute them in the binder

16  that I have, but based on your recitation you have

17  referred to Exhibits 1 through 5, Exhibit 6, Exhibit

18  7, 8, 9, 10, 11, 12 and 13.

19            Are you seeking admission of all of those

20  documents?

21            MR. ROSENDORF:  Yes, Your Honor, we would.

22            THE COURT:  Okay.  Then I'm going to ask

23  Mr. Amico and Mr. Valori to look through them and let

24  me know if they have objections to the admission of

25  any of those documents?

Page 20

```
 1              MR. VALORI:  Assuming the proffer
 2  contained an authentication of these business records,
 3  we don't object.  The other documents towards the back
 4  are of public record, and we don't object to them.
 5              THE COURT:  Okay.  They're not all
 6  business records, there is a photograph.
 7              MR. VALORI:  I believe the photograph is
 8  of a UPS receipt.
 9              THE COURT:  It's of the front door of --
10  according to the proffer, it's of the front door of
11  the business.
12              MR. VALORI:  No, we're not objecting.
13              THE COURT:  Okay.  Mr. Amico, do you
14  object on behalf of your client?
15              MR. AMICO:  I do not object.
16              THE COURT:  Okay.  Then I will admit
17  Exhibits 1 through 13.
18              (Thereupon, Exhibit Numbers 1 through 13
19  were admitted into evidence.)
20              THE COURT:  And with respect to Exhibits
21  14 and 15, those were just copies of the petitions
22  that have been filed.
23              MR. ROSENDORF:  That is correct.  I had
24  those in the register for the convenience of the
25  witnesses if they were going to be called.
```

1          THE COURT:  Okay.

2          MR. ROSENDORF:  Your Honor, based upon

3     that proffer and based upon the exhibits which the

4     Court has indicated that it will admit, we would

5     submit that the appointment of an interim trustee is

6     necessary to preserve property of the estate or to

7     prevent loss.  There is a high degree of concern that

8     assets have been and will be misused and that the

9     appointment of an interim trustee in this gap period

10    is necessary to prevent concealment or loss of assets,

11    to address what is clearly a strong uncertainty and

12    concern as to the reliability of the debtors' business

13    records as well as the nature of the debtors' business

14    itself, and so we submit that the showing required

15    under Section 303 has been met.

16          Your Honor, my clients are prepared, if

17    the Court so orders, to post the bond as is provided

18    under the statute.  And in light of the absence of

19    opposition to the motion, we would request that the

20    amount to be set would be minimal.

21          THE COURT:  Well, I'm looking at what has

22    now been at admitted as Exhibit 12 and this says that

23    this entity has negative equity of 110 million.

24          MR. ROSENDORF:  It seems like it would be

25    a little hard to do much more damage to them.

1          THE COURT:  Okay.  Let me hear first from

2   Mr. Valori on behalf of Mr. Shapiro.  Is it your

3   position that under the facts and circumstances of the

4   proffer, understanding that the posting of the bond is

5   not related to the appointment of a trustee

6   specifically, but to the filing of the involuntary, do

7   you believe that a bond is necessary, and, if so, in

8   what amount?

9          MR. VALORI:  Again, Your Honor, I'm

10   somewhat lacking in any evidence or any information

11   about this case.  So it's difficult for me to say in

12   light of the proffer that's been made, again, I

13   can't -- I don't have any opposition to the request

14   that there be a minimum -- minimal or no bond.  I

15   don't see anything that's been presented on its face

16   that gives me concern.

17          So I really, again, I apologize to the

18   Court for not having a more concrete position, but

19   again I couldn't oppose a request for minimal or no

20   bond at this time.

21          THE COURT:  Okay.  Thank you.  No, none of

22   us has ever been called at the last minute by a

23   client, so I would have no idea what you're talking

24   about.

25          Okay.  So, Mr. Amico, with respect to

1    Capitol Investments, what is your position with

2    respect to the posting of a bond?

3                MR. AMICO:  Your Honor, I'm going to

4    follow Mr. Valori's position.  With what we know, and

5    we cannot oppose a minimal or no bond.

6                THE COURT:  Okay.

7                MR. AMICO:  So if they're requesting

8    $10,000, okay.

9                THE COURT:  All right.  Thank you.

10               All right.  What I have presented before

11   me, based on the proffer that has been made and the

12   exhibits that have been entered, is that it appears

13   that there is a likelihood, at least on the proffer,

14   that the involuntary petition will ultimately be

15   granted, although, of course, that's without prejudice

16   to the alleged debtors coming in when they have a

17   better opportunity to present conflicting evidence.

18               So having made that threshold finding, the

19   next issue is whether the presentation is adequate to

20   support a finding that the appointment of a trustee is

21   necessary either to preserve property of the estate or

22   to prevent loss to the estate.

23               Based on the proffer, including the --

24   what would be considered to be admissions by

25   Mr. Shapiro, it appears to me that it is in the best

1   interest of the parties to preserve, both to preserve

2   property of the estate assuming that there is any, and

3   by estate I'm referring in each instance first to the

4   estate of Mr. Shapiro individually and, second, to the

5   estate of Capitol Investments, and also with respect

6   to preventing loss to the estate, again, the estates

7   to which I refer are both as to Mr. Shapiro

8   individually and to Capitol Investments, that it is

9   appropriate under 11 UCS Section 303(g) to at this

10  time appoint an interim trustee and I will grant the

11  motion in Case No. 09-36408 and in Case No.

12  09-36418 -- if I have repeated myself one is 08 and

13  the other is 18 -- and direct the U.S. Trustee and ask

14  Mr. Rosendorf to prepare an order in each of those

15  cases and share those orders with Mr. Valori and

16  Mr. Amico respectively.

17              I will not at this time with respect to

18  the filing of the involuntary require the posting of a

19  bond, but that is without prejudice to either

20  Mr. Shapiro or to Capitol Investments to seek if and

21  when they have further information that would make it

22  appropriate to post a bond, for them to seek that

23  relief.

24              On the other hand, I will ask Mr. Valori

25  and Mr. Amico once they've had more time to sit down

1    with their clients, to the extent that you are

2    amenable to consenting to the petition, that that be

3    done sooner than later, so this case with move forward

4    beyond the petition.  I'm not requiring that

5    obviously.  You will decide what you need to do.

6              All right.  So that takes us to the joint

7    administration motion.  It appears to me that based on

8    the pleadings that I reviewed and the proffer, that

9    there seems to be certainly a close enough identity

10   between the debtors, including the guarantee of the

11   obligations that have been described that are owed to

12   the petitioning creditors, that it would be

13   appropriate to have joint administration.

14             So, Mr. Valori, with respect to debtor

15   Shapiro, do you have any objection to joint

16   administration?

17             MR. VALORI:  No, Your Honor.

18             THE COURT:  Okay.  Mr. Amico, with respect

19   to Capitol Investments?

20             MR. AMICO:  I do not.

21             THE COURT:  Okay.  Then I will grant the

22   motion for joint administration filed in Case Number

23   09-36408, and I will grant the motion for joint

24   administration in Case No. 09-36418, and the cases

25   will be captioned but with Case No. 09-36408 which

1    is the earlier filed case.

2              So, is there anything else we need to do

3    today, Mr. Rosendorf?

4              MR. ROSENDORF:  Your Honor, if I may.  I

5    do actually have a proposed order on the joint

6    administration and do as well have orders that may

7    just require a little bit more annotation with respect

8    to the appointment of a trustee in both the company

9    and individual cases.  And if you could give us a

10   couple of minutes, we've already exchanged and

11   reviewed before the hearing, and I think that just

12   based upon the proceedings, we can make a couple of

13   tweaks and hand those up in very short order.

14             THE COURT:  Okay.  Well, rather than

15   having me stare at you and make you nervous, what I'll

16   do is go into my chambers and when the orders are

17   ready, you can bring them around.  I will ask though,

18   Mr. Valori and Mr. Amico, I believe that Mr. Rosendorf

19   handed you the original certified copies of those

20   judgments.

21             MR. ROSENDORF:  I have them back and I can

22   hand those to the Court.

23             THE COURT:  Well, I will only take them if

24   either Mr. Valori or Mr. Amico wishes to have the

25   actual originals in the exhibit register that the

Page 27

1    Court maintains.

2              MR. VALORI:  It's not necessary, Your

3    Honor.

4              THE COURT:  Okay.

5              MR. AMICO:  Agreed, Your Honor.

6              THE COURT:  Okay.  Then you may retain

7    those.

8              MR. ROSENDORF:  Very well.  May I hand up

9    the joint administration order?

10             THE COURT:  Yes, you may.  Okay.  I will

11   tell you that it's the preference of the Clerk's

12   Office normally to ask that orders be filed by

13   e-orders, but in light of the relief that is sought,

14   it's more efficient to manually sign them.  So, I'll

15   sign this and it will be entered if not today because

16   it is twenty to five, it would be tomorrow.

17             All right.  So I'll be waiting in

18   chambers.  Is anything else before we conclude the

19   hearing?

20             MR. ROSENDORF:  There's not.  I can

21   actually if -- and I don't recall how the joint

22   administration orders work, but I think that an order

23   would be entered in each of the cases.

24             THE COURT:  Yes.

25             MR. ROSENDORF:  Can I have another copy

Page 28

 1  for the other file?

 2          THE COURT:  Okay.  Sounds good.  All

 3  right.  Anything else?  Mr. Valori?  Mr. Amico?

 4          MR. ROSENDORF:  Nothing here, Your Honor,

 5  we just need to finalize the form of the orders.

 6          THE COURT: Okay.  Mr. Valori or Mr. Amico,

 7  anything else?

 8          MR. VALORI:  No, Your Honor.  Thank you.

 9          THE COURT:  Mr. Terzo?

10          MR. TERZO:  No.

11          THE COURT:  Okay.  All right.  Well then

12  that concludes the hearing.  And I'm sure I'll be

13  seeing you all again soon.

14          (Thereupon, the hearing was concluded.)

15

16

17

18

19

20

21

22

23

24

25

Page 29

CERTIFICATION

STATE OF FLORIDA )

                 )

COUNTY OF MIAMI-DADE)


        I, Carmen E. De La Cruz, shorthand Reporter

and Notary Public in and for the State of Florida at

Large, do hereby certify that the foregoing

proceedings were taken before me at the date and place

as stated in the caption hereto on Page 1; that the

foregoing computer-aided transcription is a true

record of my stenographic notes taken at said

proceedings.



        WITNESS my hand this 22nd day of

February, 2010.




                        _____

                        Carmen E. De La Cruz

                        Court Reporter and Notary Public

                        DD545111 Expiration Date 08/2011