UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

CAPITOL INVESTMENTS USA, INC. and
NEVIN KAREY SHAPIRO

_____Debtors._____/

JOEL L. TABAS, TRUSTEE,

      Plaintiff,

v.

LEWIS TEIN, P.L., LT NAUTICAL, LLC,
GUY LEWIS and MICHAEL TEIN,

      Defendants.

_____/

CASE NO.: 09-36408-BKC-LMI
(Substantively Consolidated)[1]
CASE NO. 09-36418-BKC-LMI
(Jointly Administered under
CASE NO. 09-36408-BKC-LMI)

Chapter 7

Adv. Case No.

## COMPLAINT

Joel L. Tabas, as Chapter 7 Trustee for the bankruptcy estates of Capitol Investments USA, Inc. and Pink Panther Enterprises, LLC, through undersigned counsel, sues Lewis Tein, PL, LT Nautical, LLC, Michael Tein and Guy Lewis (collectively, the "Defendants"), stating as follows:

### I.  SUBJECT MATTER JURISDICTION AND VENUE

1.      This is an adversary proceeding under Fed. R. Bank. P. 7001, *et seq.*

2.      This Court has jurisdiction of the subject matter of this proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334.

3.      This is a core proceeding as that term is defined in 28 U.S.C. § 157(b)(2)(A), (H) and (O).

---

[1] The last four digits of the taxpayer identification number for each of the consolidated debtors is, respectively, as follows in parentheses: Ocean Rock (3272), JAT (7903) and Pink Panther (5240).

1

4.    Venue in this district is proper pursuant to 28 U.S.C. § 1409(a).

## II. PERSONAL JURISDICTION OF PARTIES AND RELATIONSHIP TO CAPITOL

5.    Plaintiff, Joel L. Tabas is the duly appointed Chapter 7 Trustee for the bankruptcy estate of Capitol Investments USA, Inc. (the "Trustee"), and Trustee brings this action solely in that capacity. Trustee's principal place of business is in Miami, Florida.

6.    Debtor, Capitol Investments USA, Inc. ("Capitol") is a corporation organized under the laws of the State of Florida that had its principal place of business at 400 41st Street, #506, Miami Beach, Florida 33140.  Debtor Nevin Karey Shapiro ("Shapiro") was at all times the sole shareholder, officer and director of Capitol.

7.    Debtor, Pink Panther Enterprises, LLC ("Pink Panther") is a limited liability company organized under the laws of the State of Florida, with its principal place of business at 400 41st Street, #506, Miami Beach, FL 33140.  Shapiro is the sole member of Pink Panther. Upon information and belief, Pink Panther was a holding company which held title to a 2003 61.0' Riviera Yacht HIN #RJH58002D203 (the "Yacht").  On August 2, 2010, Pink Panther was substantively consolidated into the Capitol bankruptcy estate.

8.    Defendant, Michael Tein ("Tein") is a resident of Miami-Dade County, Florida, resides at 11045 SW 69th Avenue, Miami, Florida 33156, and is admitted to practice law in Florida.

9.    Defendant, Guy Lewis ("Lewis") is a resident of Miami-Dade County, Florida, resides at 6601 SW 126th Street, Pinecrest, Florida 33156, and is admitted to practice law in Florida.

10.    Defendant, Lewis Tein, P.L. (the "Firm") is a limited liability company organized under the laws of the state of Florida, with its principal place of business at 3059 Grand Avenue, Suite 340, Coconut Grove, FL 33133.  The Firm is a Florida law firm which holds itself out as being highly skilled and knowledgeable in the practice of criminal defense law.  Lewis and Tein are the sole managing members of the Firm.

11.    Defendant, LT Nautical, LLC ("LT Nautical") is a limited liability company organized under the laws of the state of Florida, with its principal place of business at 3059 Grand Avenue, Suite 340, Coconut Grove, FL 33133 on March 17, 2008.  Lewis and Tein are the sole managing members of LT Nautical.

### III. GENERAL ALLEGATIONS

12.    On November 30, 2009, involuntary Chapter 7 bankruptcy petitions were filed  with this Court against Capitol and Shapiro (the "Petition Date"), because Shapiro, Capitol's sole officer, director and shareholder, was believed to be winding down Capitol's business and hiding assets from Capitol's creditors.

13.    On December 11, 2009, Joel L. Tabas was appointed as interim Chapter 7 Trustee of both the Capitol and Shapiro bankruptcy cases, to prevent the dissipation of Capitol's assets in the "gap period" between the Petition Date and the Court entering an order for relief in each case [Case No. 09-36408, D.E. 14; Case No. 09-36418, D.E. 12].

14.    On December 12, 2009, this Court entered orders providing for the Capitol and Shapiro bankruptcy cases to be jointly administered [Case No. 09-36408, D.E. 17; Case No. 09-36418, D.E. 16].

15.    On December 30, 2009, this Court entered its Order for Relief in Involuntary Case and Setting Deadline for Filing Schedules, Statement of Financial

Affairs and Other Documents in each of the Capitol and Shapiro bankruptcy cases [Case No. 09-36408, D.E. 35; Case No. 09-36418, D.E. 24].

16.     On April 15, 2010, Shapiro voluntarily surrendered himself to the United States Attorney's Office in the District of New Jersey.

17.     On April 22, 2010, Joel L. Tabas was appointed as Chapter 7 trustee of the jointly administered Capitol and Shapiro bankruptcy cases [Case No. 09-36408, D.E. 333; Case No. 09-36418; D.E. 24].

18.     On September 15, 2010, Shapiro pled guilty to securities fraud and money laundering, admitting that between 2005 and 2009 Capitol had no legitimate business and that its sole business during that time period was a fraudulent Ponzi-like scheme, whereby Capitol secured a constantly increasing volume of new lender loans to fund the principal and interest payments due on previously secured and then maturing lender loans. On June 7, 2011, Shapiro was sentenced to 20 years in federal prison.

### IV.  SHAPIRO'S RELATIONSHIP WITH THE FIRM AND LT NAUTICAL

Shapiro Begins His Relationship with the Firm

19.     On February 28, 2007, the Firm entered into an engagement agreement with Shapiro (the "February 2007 Retainer Agreement") due to Shapiro's fear of criminal prosecution originating from complaints to the Federal Bureau of Investigation (the "FBI") from a Capitol lender, Robert Kallman ("Kallman") and a Capitol business associate, Craig Currie ("Currie"), alleging that Shapiro was using Capitol to engage in fraudulent conduct.  A true and correct copy of the February 2007 Retainer Agreement is attached hereto as Exhibit "1."

20.     The February 2007 Retainer Agreement reflects that the Firm would bill Shapiro on an hourly basis at set hourly rates which were specified and required a $25,000 retainer upon engagement.

21.     Capitol is not a party to and was not in any way bound by the February 2007 Retainer Agreement, which was executed by Shapiro solely in his individual capacity.

22.     The February 2007 Retainer Agreement was drafted by the Firm.

23.     At the time the Firm presented the February 2007 Retainer Agreement to Shapiro for execution, the firm had already solicited and accepted from Shapiro his trust in the Firm's superior knowledge and skill in legal matters and the Firm knew that Shapiro was relying upon the Firm to explain to him the February 2007 Retainer Agreement and to act as his fiduciary in all matters involving his representation by the Firm.

24.     The Firm never advised Shapiro or Capitol that it was representing Capitol or that Capitol owed the Firm any contractual obligations in connection with the February 2007 Retainer Agreement.

25.     The February 2007 Retainer Agreement is unambiguous regarding the lack of any responsibilities owed to the Firm by Capitol. But to the extent the Firm claims any ambiguity with respect to whether Capitol was a client of the Firm or bound by the February 2007 Retainer Agreement or owed any contractual obligation to the Firm, because the Firm drafted the February 2007 Retainer Agreement and owed a fiduciary obligation to any client it purported to represent to make clear the scope and terms of

such representation, such ambiguity must be construed in favor of determining that Capitol owed no contractual obligation to the Firm.

26.     Despite Capitol having no payment obligations under the February 2007 Retainer Agreement, Capitol paid the $25,000 retainer required to be paid by Shapiro under the February 2007 Retainer Agreement to the Firm (the "$25,000 Retainer Payment") via check number 4733 which cleared Capitol's bank account on March 5, 2007.

La Bamba Check Cashing - Shapiro Gets Indicted

27.     On January 23, 2008, the Firm entered into a second engagement agreement with Shapiro (the "January 2008 Engagement Agreement") regarding a grand jury investigation relating to money laundering.  A true and correct copy of the January 2008 Engagement Agreement is attached hereto as Exhibit "2."

28.     The January 2008 Engagement Agreement reflects a non-refundable flat fee of $500,000 payable in two installments of $250,000; the first installment due immediately and the second installment due February 29, 2008. The January 2008 Engagement Agreement further reflects that the flat fee is deemed earned in full upon execution.  Furthermore, the January 2008 Engagement Agreement reflected that if Shapiro chose to go to trial, a separate trial fee of $25,000 per day would be billed to Shapiro by the Firm and a trial deposit is due 21 days prior to the trial date.

29.     Capitol is not a party to and was not in any way bound by the January 2008 Engagement Agreement, which was executed by Shapiro solely in his individual capacity.

30.     The January 2008 Engagement Agreement was drafted by the Firm.

31.     At the time the Firm presented the January 2008 Engagement Agreement to Shapiro for execution, the firm had already solicited and accepted from Shapiro his trust in the Firm's superior knowledge and skill in legal matters and the Firm knew that Shapiro was relying upon the Firm to explain to him the January 2008 Engagement Agreement and to act as his fiduciary in all matters involving his representation by the Firm.

32.     The Firm never advised Shapiro or Capitol that it was representing Capitol or that Capitol owed the Firm any contractual obligations in connection with the January 2008 Engagement Agreement.

33.     The January 2008 Engagement Agreement is unambiguous regarding the lack of any responsibilities owed to the Firm by Capitol. But  to the extent the Firm claims any ambiguity with respect to whether Capitol was a client of the Firm or bound by the January 2008 Engagement Agreement or owed any contractual obligation to the Firm, because the Firm drafted the January 2008 Engagement Agreement and owed a fiduciary obligation to any client it purported to represent to make clear the scope and terms of such representation, such ambiguity must be construed in favor of determining that Capitol owed no contractual obligation to the Firm.

34.     On January 23, 2008, Capitol transferred $253,504.50 of lenders' funds to the bank account of Nevin K. Shapiro d/b/a NKS Financial Systems ending in X9122 (the "NKS Account") in order to pay the first installment of $250,000 pursuant to the January 2008 Engagement Agreement.

35.     The NKS Account was used frequently by Shapiro to siphon funds from Capitol's lenders for his own personal use.

36.     Upon receipt, Shapiro immediately wire transferred $250,000 of Capitol's funds to the Firm for the initial installment pursuant to the January 2008 Engagement Agreement.

37.     Shapiro did not have sufficient funds to make the second $250,000 installment pursuant to the January 2008 Engagement Agreement when said payment became due.

38.     On February 12, 2008, Capitol transferred $51,301.44 to the NKS Account for Shapiro to make a partial payment to the Firm.  Upon receipt, Shapiro transferred $50,000 of Capitol's funds to the Firm's trust account as partial payment of the second $250,000 installment pursuant to the January 2008 Engagement Agreement.

39.     In relation to the remaining $200,000 owed pursuant to the January 2008 Engagement Agreement, the Firm entered into an agreement with Shapiro whereby Shapiro would sell the Yacht (upon information and belief, owned by Pink Panther and paid for by Capitol) to LT Nautical – which was established by Lewis, Tein, and the Firm on March 17, 2008 for purposes of taking title to the Yacht – in satisfaction of the unpaid balance of the outstanding legal fees Shapiro owed to the Firm under the January 2008 Engagement Agreement.

40.     On March 19, 2008, Lewis caused a Marine Survey to be conducted with respect to the Yacht to determine its value (the "Appraisal").  A true and correct copy of the Appraisal is attached hereto as Exhibit "3."   The Appraisal reflects that the fair market value of the Yacht was $1 million and the estimated replacement value was $2 million.

41.    On March 25, 2008, the Firm sent a letter to Shapiro and his counsel, Marc Levinson, relating to the purchase of the Yacht and the potential conflict of interest pursuant to Florida Bar Rule 4-1.8(a) and requested Shapiro sign a waiver of conflict, which Shapiro executed in his individual capacity on March 26, 2008 (the "Conflict Letter").  A true and correct copy of the Conflict Letter is attached hereto as Exhibit "4."

42.    On April 9, 2008, Capitol transferred $308,500 to the NKS Account for Shapiro to be able to pay off the mortgage on the Yacht to Provident Bank through two cashiers' checks for $200,000 (the amount Shapiro owed to the Firm in outstanding legal fees) and $107,536 (remaining mortgage balance due to Provident Bank).  True and correct copies of the cashier's checks from the NKS Account to Provident Bank on April 9, 2008 in connection with the Yacht closing are attached hereto as Exhibit "5."

43.    On April 10, 2008, Shapiro (as "Seller") and LT Nautical (as "Buyer") closed on the sale of the Yacht.  A true and correct copy of the Closing Statement is attached hereto as Exhibit "6."

44.    The Closing Statement reflects that the purchase price was $850,000; $150,000 less than the $1 million fair market value reflected on the Appraisal commissioned by Lewis.

45.    Lewis and Tein named the Yacht "Knot Guilty."

46.    On April 20, 2010, during discussions relating to the circumstances of the transfer of the Yacht, Tein advised Trustee's counsel that the Yacht was sold to a third party in the beginning of April 2010 for $640,000.

47.    But LT Nautical is still an active entity and the Trustee has been unable to confirm that the Yacht was sold to a third party.

The Capitol Ponzi Scheme is Discovered

48.    In late December of 2008, Shapiro learned that the government was reviewing incoming and outgoing mail from his residence on Miami Beach via a mail cover and informed Lewis.

49.    The Firm contacted the U.S. Attorneys' Office and was informed that Shapiro was under investigation for operating Capitol as a Ponzi scheme. The Firm relayed that information to Shapiro and hurriedly entered into an engagement agreement on New Year's Eve, December 31, 2008 to investigate the bases for any potential claims against Shapiro (the "December 2008 Engagement Agreement").

50.    The December 2008 Engagement Agreement reflects that the Firm charged Shapiro a flat monthly fee of $50,000, payable in advance, by the first of each month and required Shapiro to increase his trust balance by $77,000 to bring the balance to $100,000.  The December 2008 Engagement Agreement reflects that, if Shapiro is indicted or if civil litigation is commenced, a separate engagement agreement would be required.

51.    On February 3, 2009, Capitol wire transferred $80,000 to the Firm pursuant to Shapiro's obligations under the December 2008 Engagement Agreement in order to bring the trust balance over $100,000.

52.    On March 6, 2009, Capitol wire transferred $50,000 to the Firm pursuant to Shapiro's obligations under the monthly payment requirements of the December 2008 Engagement Agreement.

53.     Capitol is not a party to and was not in any way bound by the December 2008 Engagement Agreement, which was executed by Shapiro solely in his individual capacity.

54.     The December 2008 Engagement Agreement was drafted by the Firm.

55.     At the time the Firm presented the December 2008 Engagement Agreement to Shapiro for execution, the firm had already solicited and accepted from Shapiro his trust in the Firm's superior knowledge and skill in legal matters and the Firm knew that Shapiro was relying upon the Firm to explain to him the December 2008 Engagement Agreement and to act as his fiduciary in all matters involving his representation by the Firm.

56.     The Firm never advised Shapiro or Capitol that it was representing Capitol or that Capitol owed the Firm any contractual obligations in connection with the December 2008 Engagement Agreement.

57.     The December 2008 Engagement Agreement is unambiguous regarding the lack of any responsibilities owed to the Firm by Capitol. But to the extent the Firm claims any ambiguity with respect to whether Capitol was a client of the Firm or bound by the December 2008 Engagement Agreement or owed any contractual obligation to the Firm, because the Firm drafted the December 2008 Engagement Agreement and owed a fiduciary obligation to any client it purported to represent to make clear the scope and terms of such representation, such ambiguity must be construed in favor of determining that Capitol owed no contractual obligation to the Firm.

58.     Pursuant to the Firm's internal Account QuickReport, all payments made by Shapiro to the Firm were made on behalf of the account of "190.01 Shapiro, Nevin."[2]

**COUNT 1
AVOIDANCE OF FRAUDULENT TRANSFERS PURSUANT
TO 11 U.S.C. § 544(b) AND FLA. STAT. § 726.105(1)(b)
(Capitol – Lewis Tein)**

59.     Plaintiff realleges paragraphs 1 through 58 as though fully set forth herein.

60.     Within the four (4) year period immediately preceding the Petition Date, Capitol, either directly or through the NKS Account, made payments to the Firm for Shapiro's legal fees (the "Lewis Tein Transfers").

61.     The Lewis Tein Transfers constitute a transfer of interest of Capitol's, and now, the Plaintiff's property.

62.     Because Capitol had no obligation to make payments under the February 2007 Retainer Agreement, the January 2008 Engagement Agreement and the December 2008 Engagement Agreement, Capitol did not receive any reasonably equivalent value in exchange for any of the payments which Capitol made pursuant to the February 2007 Retainer Agreement, the January 2008 Engagement Agreement and the December 2008 Engagement Agreement to the Firm.

63.     As Capitol was admittedly operating a Ponzi scheme at the time that it made the Lewis Tein Transfers:

A.     Capitol was insolvent on the date that each of the Lewis Tein Transfers was made, or became insolvent as a result of the subject transfer;

---

[2] Upon information and belief, the Firm performed very little services and was grossly and unconscionably overcompensated pursuant to the December 2008 Engagement Agreement. The Trustee sought to investigate these issues prior to filing suit however was stonewalled by the Defendants in such endeavors, and accordingly reserves the right to amend to present additional claims once discovery has been undertaken in this adversary proceeding.

B.     Capitol was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Capitol was an unreasonably small capital; or

C.     Capitol intended to incur, or believed that it would incur debts that would be beyond Capitol's ability to pay as such debts matured.

64.     As a result of the Lewis Tein Transfers, the Firm received the total sum of $455,000.

65.     Capitol had at least one creditor who could have avoided the Lewis Tein Transfers.

**WHEREFORE**, Plaintiff, Joel L. Tabas, as Chapter 7 Trustee, respectfully requests this Court enter judgment on his behalf and against Defendant, Lewis Tein, P.L., as follows:

(a)     determining that the Lewis Tein Transfers totaling $455,000.00 constitute fraudulent transfers and are avoidable pursuant to Section 726.105(1)(b) of the Florida Statutes; and

(b)     granting such other and further relief as this Court deems just and proper.

**COUNT 2**
**RECOVERY OF FRAUDULENT TRANSFERS PURSUANT TO**
**FLA. STAT. §726.108 AND FLA. STAT. §726.109**
**(Capitol – Lewis Tein)**

66.     Plaintiff incorporates and realleges paragraphs 1 through 58 and 60 through 65 of this Complaint as though fully set forth herein.

67.     The Lewis Tein Transfers are avoidable by Plaintiff pursuant to Section 726.105(1)(b) of the Florida Statutes, and as a result, such Lewis Tein Transfers are recoverable by the Plaintiff pursuant to Sections 726.108 and 726.109 of the Florida

Statutes and Section 544 of the Bankruptcy Code.

68.     The Firm was the initial transferee of $155,000 of the Lewis Tein Transfers directly from Capitol and was the subsequent transferee of $300,000 of the Lewis Tein Transfers Capitol funded to the Firm through the NKS Account.

69.     As a result, Plaintiff may recover the value of the Lewis Tein Transfers from the Defendant, Lewis Tein, P.L., pursuant to Sections 726.108 and 726.109 of the Florida Statutes and Section 544 of the Bankruptcy Code.

**WHEREFORE**, Plaintiff, Joel L. Tabas, as Chapter Trustee, respectfully requests that this Court enter a judgment on his behalf and against Defendant, Lewis Tein, P.L., as follows:

(a)     declaring Lewis Tein, P.L. the initial transferee of the Lewis Tein Transfers in the total amount of $155,000;

(b)     declaring Lewis Tein, P.L. the subsequent transferee of the Lewis Tein Transfers in the total amount of $300,000;

(c)     awarding damages in the total amount of $455,000, plus pre-judgment interest and attorneys' fees in favor of the Trustee and directing Lewis Tein, P.L. to turn over the Lewis Tein Transfers pursuant to Sections 726.108 and 726.109 of the Florida Statutes and Section 544 of the Bankruptcy Code; and

(d)     granting such other and further relief as this Court deems just and proper.

**COUNT 3**
**AVOIDANCE OF FRAUDULENT TRANSFERS PURSUANT**
**TO 11 U.S.C. § 544(b) AND FLA. STAT. § 726.105(1)(b)**
**(Capitol & Pink Panther – LT Nautical, Lewis & Tein)**

70.     Plaintiff realleges paragraphs 1 through 58 as though fully set forth herein.

71.     Within the four (4) year period immediately preceding the Petition Date, Pink Panther transferred the Yacht to LT Nautical for the benefit of Lewis and Tein in satisfaction of outstanding legal fees owed by Shapiro (the "Yacht Transfer").

72.     The Yacht Transfer constitutes a transfer of interest of Capitol's and Pink Panther's, and now, the Plaintiff's property.

73.     Because Capitol and Pink Panther had no obligation to make payments under the January 2008 Engagement Agreement, neither Capitol nor Pink Panther received any reasonably equivalent value in exchange for transferring the Yacht in partial satisfaction of payment obligations due by Shapiro to the Firm pursuant to the January 2008 Engagement Agreement.

74.     As Pink Panther was at all times the alter ego of Capitol, which was admittedly operating a Ponzi scheme at the time that Capitol and Pink Panther made the Yacht Transfer:

A.     Capitol and Pink Panther were insolvent on the date that the Yacht Transfer was made, or became insolvent as a result of the subject transfer;

B.     Capitol and Pink Panther was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Capitol and Pink Panther was an unreasonably small capital; or

C.      Capitol and Pink Panther intended to incur, or believed that it would incur debts that would be beyond Capitol's and Pink Panther's ability to pay as such debts matured.

75.     As a result of the Yacht Transfer, the Firm received the Yacht for less than fair market value.

76.     Capitol and Pink Panther had at least one creditor who could have avoided the Yacht Transfer.

**WHEREFORE**, Plaintiff, Joel L. Tabas, as Chapter 7 Trustee, respectfully requests this Court enter judgment on his behalf and against Defendants, LT Nautical, LLC, Michael Tein and Guy Lewis, jointly and severally, as follows:

(a)      determining that the Yacht Transfer constitutes a fraudulent transfer and is avoidable pursuant to Section 726.105(1)(b) of the Florida Statutes; and

(b)      granting such other and further relief as this Court deems just and proper.

**COUNT 4**
**RECOVERY OF FRAUDULENT TRANSFERS PURSUANT TO**
**FLA. STAT. §726.108 AND FLA. STAT. §726.109**
**(Capitol and Pink Panther – LT Nautical, Lewis & Tein)**

77.     Plaintiff incorporates and realleges paragraphs 1 through 58 and 71 through 76 of this Complaint as though fully set forth herein.

78.     The Yacht Transfer is avoidable by Plaintiff pursuant to Section 726.105(1)(b) of the Florida Statutes, and as a result, such Yacht Transfer is recoverable by the Plaintiff pursuant to Sections 726.108 and 726.109 of the Florida Statutes and Section 544 of the Bankruptcy Code.

79.     LT Nautical was the initial transferee of Yacht Transfer and Lewis and Tein were the persons for whose benefit the Yacht Transfer was made.

80.    As a result, Plaintiff may recover the value of the Yacht Transfer from the Defendants, LT Nautical, LLC, Michael Tein and Guy Lewis, jointly and severally, in the total amount of $457,536 pursuant to Sections 726.108 and 726.109 of the Florida Statutes and Section 544 of the Bankruptcy Code.

**WHEREFORE**, Plaintiff, Joel L. Tabas, as Chapter Trustee, respectfully requests that this Court enter a judgment on his behalf and against Defendants, LT Nautical, LLC, Michael Tein and Guy Lewis, jointly and severally, as follows:

(a)    declaring LT Nautical, LLC the initial transferee of the Yacht Transfer in the amount of $457,536;

(b)    declaring Michael Tein and Guy Lewis the persons for whose benefit the Yacht Transfer was made;

(c)    awarding damages in the total amount of $457,536 against LT Nautical, LLC, Michael Tein and Guy Lewis, jointly and severally, plus pre-judgment interest and attorneys' fees in favor of the Trustee and directing LT Nautical, LLC, Michael Tein and Guy Lewis to turn over the value of the Yacht Transfer pursuant to Sections 726.108 and 726.109 of the Florida Statutes and Section 544 of the Bankruptcy Code; and

(d)    granting such other and further relief as this Court deems just and proper.

**COUNT 5**
**ACTION SEEKING DAMAGES FOR UNJUST ENRICHMENT**
**(Capitol and Pink Panther – LT Nautical)**

81.    Plaintiff incorporates and realleges paragraphs 1 through 58 of this Complaint as though fully set forth herein.

82.    Capitol and Pink Panther made the Yacht Transfer to LT Nautical for the benefit of Guy Lewis and Michael Tein as set forth in Count 3.

83.     The Yacht Transfer constitutes a transfer of Capitol's and Pink Panther's, and now, the Plaintiff's property.

84.     As a result of the Yacht Transfer, LT Nautical, Guy Lewis and Michael Tein received the benefit of the Yacht Transfer in the total amount of $457,536 as neither Capitol nor Pink Panther were indebted to the Firm, LT Nautical, Lewis or Tein and LT Nautical purchased the Yacht for less than fair market value which benefited Lewis and Tein.

85.     As Pink Panther was the alter ego of Capitol and Capitol was admittedly operating a Ponzi scheme, LT Nautical, LLC, Guy Lewis and Michael Tein have no right to retain the benefit of the Yacht Transfer totaling $457,536.

86.     LT Nautical, LLC, Guy Lewis and Michael Tein voluntarily accepted and retained the benefits conferred.

87.     The circumstances are such that it would be inequitable for LT Nautical, LLC, Guy Lewis and Michael Tein to retain the benefits without paying the value thereof to Plaintiff.

**WHEREFORE**, Plaintiff, Joel L. Tabas, as Chapter 7 Trustee, respectfully requests that this Court enter a judgment on his behalf and against Defendants, LT Nautical, LLC, Guy Lewis and Michael Tein, jointly and severally, in the total amount of $457,536, plus pre-judgment interest and attorneys' fees in favor of the Trustee and for such other and further relief as this Court deems just and proper.

**COUNT 6**
**ACTION FOR IMPOSITION OF EQUITABLE**
**LIEN TO PREVENT UNJUST ENRICHMENT**
**(Capitol and Pink Panther – LT Nautical)**

88.    Plaintiff incorporates and realleges paragraphs 1 through 58 and 82 through 87 of this Complaint as though fully set forth herein.

89.    As the Trustee has not been able to confirm that the Yacht has been sold by LT Nautical to a third party, the Trustee is asserting Count 6 to the extent LT Nautical, Lewis or Tein still have an ownership interest in the Yacht.

90.    Capitol and Pink Panther made the Yacht Transfer to LT Nautical for the benefit of Lewis and Tein.

91.    The Yacht Transfer, constitutes a transfer of interest of Capitol's and Pink Panther's, and now, the Plaintiff's property.

92.    As a result of the Yacht Transfer, LT Nautical received the Yacht for less than a reasonably equivalent value as (i) neither Capitol nor Pink Panther were indebted to the Firm, LT Nautical, Lewis or Tein and (ii) the Yacht was sold for less than fair market value to LT Nautical for the benefit of Lewis and Tein.

93.    As Pink Panther was an alter ego of Capitol, which was admittedly operating a Ponzi scheme at the time that it made the Yacht Transfer, LT Nautical, LLC, Guy Lewis and Michael Tein have no right to retain the benefits of the Yacht Transfer totaling $457,536.

94.    LT Nautical, LLC, Guy Lewis and Michael Tein voluntarily accepted and retained the benefits conferred.

95.     The circumstances are such that it would be inequitable for LT Nautical, LLC, Guy Lewis and Michael Tein to retain the benefits without paying the value thereof to Plaintiff.

96.     An equitable lien against the Yacht in the amount of the Yacht Transfer is appropriate because it will prevent unjust enrichment.

97.     The equitable lien will leave LT Nautical, LLC, Guy Lewis and Michael Tein no worse off than they would have been, had they (i) paid a fair market value for the Yacht and (ii) made the payments themselves that were made by Pink Panther and Capitol paid at the closing on the Yacht.

**WHEREFORE**, Plaintiff, Joel L. Tabas, as Chapter 7 Trustee, respectfully requests that this Court enter a judgment on his behalf and against Defendants, LT Nautical, LLC, Guy Lewis and Michael Tein, jointly and severally, imposing an equitable lien on the Yacht in the total amount of $457,536, plus pre-judgment interest and attorneys' fees in favor of the Trustee and for such other and further relief as this Court deems just and proper.

## COUNT 7
## AVOIDANCE OF FRAUDULENT TRANSFERS
## PURSUANT TO 11 U.S.C. § 544(b) AND FLA. STAT. § 726.105(1)(a)
### (Capitol – Lewis Tein)

98.     Plaintiff incorporates and realleges paragraphs 1 through 58 of this Complaint as though fully set forth herein.

99.     Count 7 is an alternative basis for relief to Count 1.

100.     Within four years of the Petition Date, Capitol made the Lewis Tein Transfers to the Firm.

101.     The Lewis Tein Transfers constitute transfers of interest of Capitol's, and

now, the Plaintiff's property.

102.    The Lewis Tein Transfers were made to and for the benefit of the Defendant, Lewis Tein, P.L.

103.    Capitol made the Lewis Tein Transfers to the Firm in an effort to stave off the collapse of the Capitol Scheme by keeping Shapiro, its sole officer and director, out of prison by paying the legal fees for his criminal defense team.

104.    Accordingly, Capitol made the Lewis Tein Transfers to the Firm with actual intent to hinder, delay or defraud an entity to which Capitol was or became, on or after the date that the Lewis Tein Transfers were made, indebted.

105.    Capitol has at least one creditor who could have avoided the Lewis Tein Transfers.

106.    As a result of the Lewis Tein Transfers, Lewis Tein, P.L. received the total sum of $455,000.

**WHEREFORE**, Plaintiff, Joel L. Tabas, as Chapter 7 Trustee, respectfully requests this Court enter judgment on his behalf and against the Defendant, Lewis Tein, P.L., as follows:

(a)    determining that the Lewis Tein Transfers totaling $455,000 constitute fraudulent transfers and are avoidable pursuant to Section 726.105(1)(a) of the Florida Statutes; and

(b)    granting such other and further relief as this Court deems just and proper.

## COUNT 8
## RECOVERY OF FRAUDULENT TRANSFERS PURSUANT TO
## FLA. STAT. §726.108 AND FLA. STAT. §726.109
## (Capitol – Lewis Tein)

107.   Plaintiff incorporates and realleges paragraphs 1 through 58 and 100 through 106 of this Complaint as though fully set forth herein.

108.   The Lewis Tein Transfers are avoidable by Plaintiff pursuant to Section 726.105(1)(a) of the Florida Statutes, and as a result, such Lewis Tein Transfers are recoverable by the Plaintiff pursuant to Sections 726.108 and 726.109 of the Florida Statutes and Section 544 of the Bankruptcy Code.

109.   The Firm was the initial transferee of $155,000 of the Lewis Tein Transfers directly from Capitol and was the subsequent transferee of $300,000 of the Lewis Tein Transfers Capitol funded to the Firm through the NKS Account.

110.   As a result, Plaintiff may recover the value of the Lewis Tein Transfers from Defendant, Lewis Tein, P.L., pursuant to Sections 726.108 and 726.109 of the Florida Statutes.

**WHEREFORE**, Plaintiff, Joel L. Tabas, as Chapter Trustee, respectfully requests that this Court enter a judgment on his behalf and against Defendant, Lewis Tein, P.L, as follows:

(a)    declaring Lewis Tein, P.L. the initial transferee of the Lewis Tein Transfers in the total amount of $155,000;

(b)    declaring Lewis Tein, P.L. the subsequent transferee of the Lewis Tein Transfers in the total amount of $300,000;

(c)    awarding damages in the total amount of $455,000, plus pre-judgment interest and attorneys' fees in favor of the Trustee and directing Lewis Tein, P.L. to turn

over the Lewis Tein Transfers pursuant to Sections 726.108 and 726.109 of the Florida Statutes and Section 544 of the Bankruptcy Code; and

(d)    granting such other and further relief as this Court deems just and proper.

### COUNT 9
### AVOIDANCE OF FRAUDULENT TRANSFERS
### PURSUANT TO 11 U.S.C. § 544(b) AND FLA. STAT. § 726.105(1)(a)
### (Pink Panther – LT Nautical, Lewis & Tein)

111.    Plaintiff incorporates and realleges paragraphs 1 through 58 of this Complaint as though fully set forth herein.

112.    Count 9 is an alternative to Count 3.

113.    Within four years of the Petition Date, Pink Panther made the Yacht Transfer to LT Nautical for the benefit of Lewis and Tein.

114.    The Yacht Transfer constitutes a transfer of interest of Pink Panther's, and now, the Plaintiff's property.

115.    The Yacht Transfer was made to LT Nautical for the benefit of Lewis and Tein.

116.    Capitol and Pink Panther made the Yacht Transfer to LT Nautical for the benefit of Lewis and Tein in an effort to stave off the detection of their fraudulent purpose of operating Capitol as a Ponzi scheme and operating Pink Panther as its alter ego to shelter assets (i.e. the Yacht), by keeping Shapiro, Capitol's sole officer and director, out of prison by paying the legal fees for his criminal defense team.

117.    Accordingly, Capitol and Pink Panther made the Yacht Transfer to LT Nautical for the benefit of Lewis and Tein with actual intent to hinder, delay or defraud an entity to which Capitol and Pink Panther were or became, on or after the date that the Yacht Transfer was made, indebted.

118.    Capitol and Pink Panther have at least one creditor who could have avoided the Yacht Transfer.

119.    As a result of the Yacht Transfer, the Firm received the Yacht for less than fair market value.

**WHEREFORE**, Plaintiff, Joel L. Tabas, as Chapter 7 Trustee, respectfully requests this Court enter judgment on his behalf and against the Defendants, LT Nautical, LLC, Guy Lewis and Michael Tein, jointly and severally, as follows:

(a)    determining that the Yacht Transfer constitutes a fraudulent transfer and is avoidable pursuant to Section 726.105(1)(b) of the Florida Statutes; and

(b)    granting such other and further relief as this Court deems just and proper.

**COUNT 10**
**RECOVERY OF FRAUDULENT TRANSFERS PURSUANT TO**
**FLA. STAT. §726.108 AND FLA. STAT. §726.109**
**(Pink Panther – LT Nautical, Lewis & Tein)**

120.    Plaintiff incorporates and realleges paragraphs 1 through 58 and 113 through 119 of this Complaint as though fully set forth herein.

121.    The Yacht Transfer is avoidable by Plaintiff pursuant to Section 726.105(1)(a) of the Florida Statutes, and as a result, such Yacht Transfer is recoverable by the Plaintiff pursuant to Sections 726.108 and 726.109 of the Florida Statutes and Section 544 of the Bankruptcy Code.

122.    LT Nautical was the initial transferee of the Yacht Transfer and Lewis and Tein were the persons for whose benefit the Yacht Transfer was made.

123.    As a result, Plaintiff may recover the value of the Yacht Transfer from Defendants, LT Nautical, LLC, Guy Lewis and Michael Tein, jointly and severally, pursuant to Sections 726.108 and 726.109 of the Florida Statutes.

**WHEREFORE**, Plaintiff, Joel L. Tabas, as Chapter Trustee, respectfully requests that this Court enter a judgment on his behalf and against Defendants, LT Nautical, LLC, Guy Lewis and Michael Tein, jointly and severally, as follows:

(a)    declaring LT Nautical, LLC the initial transferee of the Yacht Transfer in the amount of $457,536;

(b)    declaring Michael Tein and Guy Lewis the persons for whose benefit the Yacht Transfer was made;

(c)    awarding damages in the total amount of $457,536 against LT Nautical, LLC, Michael Tein and Guy Lewis, jointly and severally, plus pre-judgment interest and attorneys' fees in favor of the Trustee and directing LT Nautical, LLC, Michael Tein and Guy Lewis to turn over the value of the Yacht Transfer pursuant to Sections 726.108 and 726.109 of the Florida Statutes and Section 544 of the Bankruptcy Code; and

(d)    granting such other and further relief as this Court deems just and proper.

Respectfully submitted this 13th day of June, 2011.

/s/ Robert B. Miller
Robert B. Miller 305685
Gary M. Freedman
Florida Bar No.: 727260
Andrea L. Rigali
Florida Bar No.: 42015
Tabas, Freedman, Soloff, Miller & Brown, P.A.
Attorneys for Joel L. Tabas
One Flagler Building
14 Northeast First Avenue, Penthouse
Miami, Florida 33132
Telephone:  (305) 375-8171
Facsimile:  (305) 381-7708
E-mail: gary@tabasfreedman.com
E-mail: robert@tabasfreedman.com
E-mail: andrea@tabasfreedman.com

# Lewis Tein PL
ATTORNEYS AT LAW

February 28, 2007

PRIVILEGED AND CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

Nevin Shapiro
*Via email*

Re:    Engagement Agreement
       Potential Federal Criminal Investigation

Dear Mr. Shapiro:

It was a pleasure meeting with you at our office this week. We are pleased that you have chosen the law firm of Lewis Tein, P.L. to represent you in the matter described below.  In accordance with our normal procedures, this letter is intended to describe the scope of the services that the law firm has been retained to provide during this engagement as well as the terms and conditions of the engagement.

Regarding the scope of our representation, we understand that the law firm is being retained to represent you to render legal services in connection with a potential federal criminal investigation relating to your grocery-diverting business. Our engagement is for all aspects of the investigatory (pre-charge) phase of this matter only.  In the event that the Client is charged in a criminal case and the law firm is required to enter a permanent appearance, the law firm will require a separate engagement agreement.

Regarding this firm's compensation, we bill for our services on an hourly basis, generally recording our time in ten-minute increments.  The hourly rates for the attorneys who will work on this matter vary depending on a number of factors, including the attorney's experience,

3059 Grand Avenue, Suite 340, Coconut Grove, Florida 33133
Tel. 305.442.1101  Fax 305.442.6744  www.lewistein.com

EXHIBIT
1

**Lewis Tein** P.L.
ATTORNEYS AT LAW

Nevin Shapiro
February 28, 2007
Page 2 of 3

expertise and subject matter involved. In this regard, Guy Lewis' hourly rate is $750 and Michael Tein's is $550. The hourly rates of the associate attorneys who may work on your matter range from $250 to $350. The hourly rate for our paralegals is $110 and the hourly rate for our law clerks is $95. We require a $25,000 retainer upon engagement to be held in trust and applied to our final invoice. The retainer may be wire-transferred to our trust account with the following instructions:

Lewis Tein, P.L. Trust Account
Great Florida Bank
2 South Biscayne Boulevard
Miami, Florida 33131
Bank Routing # 066015576
Bank Account # 400000097.

The Client authorizes Lewis Tein to transfer any monies held in trust for the payment of legal fees and/or costs. Any unused portion of the retainer will be refunded to the Client at the conclusion of the representation.

The Client acknowledges that Lewis Tein will incur various costs in providing services to the Client. The above-described fees do not include expenses for the employment of investigators, experts, court reporters, transcripts, process servers, first-class travel, lodging and food, or any other out-of-pocket expenses necessary to prepare the case.

**Capitol/LewisTein003679**

Lewis Tein PL
ATTORNEYS AT LAW

Nevin Shapiro
February 28, 2007
Page 3 of 3

We look forward to representing you in this investigation. If the terms of this engagement letter are acceptable, please execute this letter below and return the original to us, retaining a copy for your file.

With kindest regards, I remain,

Very truly yours,

GUY A. LEWIS
MICHAEL R. TEIN

LEWIS TEIN, P.L.

I accept the terms of the foregoing:

NEVIN SHAPIRO                    DATED: 2/28/07

3059 Grand Avenue, Suite 340, Coconut Grove, Florida 33133
Tel. 305.442.1101  Fax 305.442.6744  www.lewistein.com

Capitol/LewisTein003680

# LEWIS TEIN PL
### ATTORNEYS AT LAW

PRIVILEGED ATTORNEY-CLIENT COMMUNICATION

January 23, 2008

Mr. Nevin Shapiro
5380 N. Bay Road
Miami Beach, Florida 33139

*Via electronic mail*

Re:  **Engagement Agreement**
    Federal Grand Jury Investigation concerning Money-
    Laundering (18 USC § 1956); Money-Laundering Conspiracy
    (18 USC § 1957); Causing Filing of False Currency Transaction
    Reports (31 USC § 5313; 31 USC § 5324), etc.

Dear Nevin:

We are pleased that you have chosen the law firm of Lewis
Tein, P.L. to represent you to represent you render legal services in
connection with the above-referenced federal criminal investigation.

The law firm's engagement fee for all pre-trial phases of this
representation is a non-refundable flat fee of $500,000.  This fee is
payable in two installments, as follows:

$250,000   due immediately;

$250,000   due February 29, 2008.

This engagement fee is deemed earned in full upon execution
of this agreement and is non-refundable due in part to the fact that
the law firm may, in its discretion, decline to participate in other
prospective cases to accommodate the client's case.  Moreover, the
entire engagement fee is deemed earned regardless of when or how
your case is resolved.

3059 Grand Avenue, Suite 340, Coconut Grove, Florida 33133
Tel: 305.442.1101 Fax: 305.442.6744 www.lewistein.com

**Capitol/LewisTein003681**

EXHIBIT
**2**

The engagement fee covers our representation of you in all pre-trial phases of your matter (including pre-indictment investigation, grand jury proceedings, any proceedings relating to any indictment, arraignment, any pre-trial motions and all pre-trial hearings). In the event that you elect to proceed to **trial** (as opposed to a non-trial disposition), the law firm will require an additional trial fee, separate from the initial engagement fee. Our law firm's trial fee is $25,000 per day and we require a pre-trial deposit to be held in trust, equal to the fees that would cover the estimated number of trial days. The trial-fee deposit is due 21 days prior to the trial date. Any remaining balance will be refunded to you after the conclusion of the trial.

The above-described engagement fee and trial fee do not include expenses for the employment of investigators, experts, court reporters, transcripts, process servers, travel, lodging and food, or any other out-of-pocket expenses necessary to prepare the case. The client is required to reimburse the law firm for such costs.

The law firm will use its best efforts and professional skills to obtain the most favorable result possible for the client. The firm does not make any promises or guarantees that such a result can or will be achieved.

[This space intentionally left blank.]

Capitol/LewisTein003682

Nevin, we sincerely look forward to representing you in this matter and, unless we are otherwise advised, the scope of our representation will be limited to providing the legal services necessary to accomplish the foregoing.

If the terms of this engagement letter are acceptable, please sign and date this letter below and return the original to us, retaining a copy for your files. Until then, I remain with kindest regards,

Very truly yours,

GUY A. LEWIS
MICHAEL R. TEIN
LEWIS TEIN, P.L.

I agree to the foregoing:

NEVIN SHAPIRO

DATED: _1/23/08_

Capitol/LewisTein003683

# REPORT OF MARINE SURVEY

**OF THE VESSEL**

*"All Axcess"*

**2003 Riviera 58 Enclosed Bridge Sportfish**

CONDUCTED BY

NED R HICKEL

MARINE SURVEYOR / S.A.M.S.  AMS

PREPARED FOR:

Guy Lewis

3/19/08

**EXHIBIT**

**3**

MEMBER OF SOCIETY OF ACCREDITED MARINE SURVEYORS

# GALE FORCE SURVEYS .com

WWW.GALEFORCESURVEYS.COM
1521Alton Road #545 ~ Miami Beach  FL.   33139 ~ USA
Phone (305) 799-6080 ~ Fax 305-534-6621 ~ **Email: INFO@GALEFORCESURVEYS.COM**
GALE FORCE SURVEYS OF MIAMI BEACH ~ YOUR SCHEDULE IS OUR DEADLINE

3/19/08

**RE: SURVEY – 2003 Riviera 58 Enclosed Bridge Sportfish**          **HIN# RJH58002D203**

To whom it may concern,

At  Guy Lewis's request, I performed an Insurance condition and value marine survey to evaluate the vessel's present condition and estimate its fair market value and replacement cost.

This vessel was personally inspected on 3/19/08 in the water at Miami Beach Marina, Miami Beach, FL.

The vessel was found to be in Average condition.

This vessel is **considered suitable for her intended use.**

During this survey, all parts and portions which were accessible without the removal of bulkheads, decks, overheads and / or other fixed items, etc. were carefully examined.  Every effort was made to determine the vessels condition, and market value compared with other vessels of similar size and appointment.

As a result of my investigation, and by virtue of my experience, my opinion is as follows:

| | |
|---|---|
| **OVERALL VESSEL CONDITION** | **Average** |
| **FAIR MARKET VALUE** | **$1,000,000.00** |
| **ESTIMATED REPLACEMENT VALUE** | **$2,000,000.00** |

Respectfully submitted,

 Ned R. Hickel

Ned R. Hickel   AMS
Attending Surveyor

**Society of Accredited Marine Surveyors® AMS**
**American Boat and Yacht® Standards Accredited**

# I. INTRODUCTION

## SCOPE OF SURVEY

Acting at Guy Lewis's request, on 3/19/08, surveyor conducted an Insurance Condition and Value survey of a *2003 Riviera 58 Enclosed Flybridge Sportfish* located at Miami Beach Marina, Miami Beach, FL. The vessel's papers were onboard.  A sea trial was not performed. The vessel was surveyed in the water. No haulout was performed.

This survey report represents the condition of the vessel on the above date, and is the unbiased opinion of the undersigned, but it is not to be considered an inventory or an implied or specified warranty.  No reference or information contained in this report should be construed as an  evaluation or indication of the internal condition of the engines or the propulsion system's operating capacity.

**NOTE:** It is recommended and understood that all Diesel / Gas engines be surveyed by a qualified Engine Surveyor to determine the condition of the engines, gears and pumps, heat exchangers, coolers, etc.

 **INTENDED USERS: This survey is prepared for the exclusive use of the client whose name and address appear on Page 2, and this report is not transferable to any other person or entity. The intended users of this report are for the client and those lenders and underwriters considering financing or insuring this vessel for this client only.This report by itself does not contain all the components necessary for a prepurchase decision, and other potential buyers are specifically excluded as third party users of this report.**

OF SURVEY:

THE MANDATORY STANDARDS PROMULGATED BY THE UNITED STATES COAST GUARD (USCG), UNDER THE AUTHORITY OF TITLE 46 UNITED STATES CODE (USC); TITLE 33 AND TITLE 46, CODE OF FEDERAL REGULATIONS (CFR),  AND THE VOLUNTARY STANDARDS AND RECOMMENDED PRACTICES DEVELOPED BY THE AMERICAN BOAT AND YACHT COUNCIL (ABYC) AND THE NATIONAL FIRE PROTECTION ASSOCIATION (NFPA) HAVE BEEN USED AS GUIDELINES IN THE CONDUCT OF THIS SURVEY.

# II. GENERAL INFORMATION

## GENERAL INFORMATION

SURVEY PREPARED FOR: . . . . . . . . . . . . . . . . . . . . .    **Guy Lewis**

| | |
|---|---|
| OWNER'S NAME: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **Nevin Shapiro** |
| OWNER'S ADDRESS: . . . . . . . . . . . . . . . . . . . . . . . . . | **4045 Sheridan Ave. #373, Miami Beach, FL. 33140** |
| FILE NUMBER: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **0358RIV** |
| NAME OF VESSEL: . . . . . . . . . . . . . . . . . . . . . . . . . . | **"All Axcess"** |
| OVERALL VESSEL RATING: . . . . . . . . . . . . . . . . . . . . | **AVERAGE** |
| ESTIMATED MARKET VALUE:. . . . . . . . . . . . . . . . . . | **$1,000.000.00** |
| ESTIMATED REPLACEMENT COST:. . . . . . . . . . . . . | **$2,000,000.00** |
| YEAR/MAKE/MODEL OF VESSEL: . . . . . . . . . . . . . . . | **2003 Riviera 58 Enclosed Bridge Sportfish** |
| BUILDER: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **Riviera Yachts, Coomera, Australia.** |
| HULL IDENTIFICATION NUMBER (HIN): . . . . . . . . . . | **RJH58002D203** |
| HAILING PORT: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **None Sighted.** |
| USCG DOCUMENTATION NUMBER: . . . . . . . . . . . . . | **1139800** |
| USCG DOCUMENTED FOR: . . . . . . . . . . . . . . . . . . . . | **Recreational** |
| STATE REGISTRATION NUMBER: . . . . . . . . . . . . . . . | **None Sighted** |
| PLACE OF SURVEY: . . . . . . . . . . . . . . . . . . . . . . . . . | **Miami Beach Marina, Miami Beach, FL.** |
| DATE OF SURVEY: . . . . . . . . . . . . . . . . . . . . . . . . . . | **3/19/08** |
| LENGTH OVER ALL (L.O.A).: . . . . . . . . . . . . . . . . . . | **58'** |
| BEAM: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **17'9"** |
| DRAFT: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **5'** |
| DISPLACEMENT: . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **50,000 lbs approximately** |
| PROPULSION SYSTEM: . . . . . . . . . . . . . . . . . . . . . . | **Twin Diesel.** |
| FUEL TYPE: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **Diesel.** |
| FUEL CAPACITY: . . . . . . . . . . . . . . . . . . . . . . . . . . . | **1100 Gallons.** |
| INTENDED USE: . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **Recreational Cruising.** |

# III. SYSTEMS

## HULL DECK AND SUPERSTRUCTURE

### HULL CONSTRUCTION

*TYPE:* Modified-V, planing type, with flared bow.

*MATERIAL:* FRP (fiber reinforced plastic) with cored hullsides and deck.

*EXTERIOR HULL:* White gelcoat with black boot top, and moderate sheer.

*BULKHEADS:* Athwartships reinforcement enhanced by wood bulkheads bonded to the hull with FRP (fiber reinforced plastic). In good condition where sighted. No signs of tabbing failure or separation from the the hullsides.

*STRINGERS:* Hull stiffness provided by FRP longitudinal and athwartship stringers. Complete inspection not possible due to limited access. Serviceable where observed. No signs of cracking or damage sighted at time of survey.

  ＊ *TRANSOM:*    **[C1]** Large transom with swim platform, transom door, fold down swim ladder, SS rub rail, livewell, SS chocks and cleats, storage lockers and and small pop up cleats.

  ＊ *BILGE:*    **[C2]** Deep (below deck) bilge area provides room for most boat systems and tankage. Generally clean.

*LIMBER HOLES:* Limber holes are of adequate size and clear where sighted.

### DECK CONSTRUCTION

*TYPE:* Sportfish convertible layout with an enclosed half tower.

*MATERIAL:* Cored FRP (fiber reinforced plastic) with white gelcoat and molded in non-skid surface.

  ＊ *COCKPIT:*    **[C3]** Nicely arranged with teak deck, Pompanette fighting chair, storage lockers, lighting, four large in deck hatches. two molded in steps, 24 vdc outlets, manual bilge pumps, phone / tv inlet, Tackle station with storage, prepsink, bait freezer and tackle drawers, engine room door and hatch, sliding glass window, glass door to salon, under step ice box, two large indeck fish boxes, lighting, speakers, seven step ladder to flybridge and powder coated grab rails.

### HULL-TO-DECK JOINT

*TYPE:* Hull is overlap, coffee can style.

*FASTENERS:* Stainless steel screws. The hull to deck joint is heavily glassed together and in good condition where sighted.

### DECK FITTINGS

*CHOCKS AND CLEATS:* Chocks and cleats appeared to be stainless steel. All sighted were thru-bolted and serviceable.

*HATCHES:* Six large Bomar hatches on foredeck. All servicable and in good condition.

*GRAB RAIL:* Enough for safe maneuvering around vessel.

### HELM AREA

*HELM AREA / FORE DECK:* Large enclosed upper flybridge with large helm, wheel, electric helm chairs, controls, electronics, wet bar with refrigerator / freezer, storage, closed circuit camera system, air conditioning, lighting, flybridge overhang with safety rails, rod holders, small helm station, speakers, lighting, access hatch to top of cabin and a white non skid surface, overhead grab rails, tinted glass, door to aft deck, over head hatch, vinyl head lining, L shaped leather couch, teak and holly sole and snap in sun curtains. Fore deck features 6 hatches, Quick lift davit, bow rail and two jet ski cradles.

*WINDOWS/PORTS/DOORS:* Operable and secure where inspected. No signs of leakage or abuse. Servicable.

*FITTINGS AND HARDWARE:* All stainless steel fittings and associated hardware inspected on the vessel are in good condition.

*JOINERY STRESS:* Small cracking and crazing in gelcoat around vessel. Fair condition.

*WINDSHIELD:* Large three piece windshield with wipers. Servicable.

### ADDITIONAL EQUIPMENT AND ACCESSORIES

*DINGHY/TENDERS:* No dingy, but large davit on bow.

*CANVAS AND COVERS:* Upper helm station cover noted.

---

# III. SYSTEMS

## CABIN APPOINTMENTS

**INTERIOR DESCRIPTION:**

* *LAYOUT:*  **[C4]**  Enter salon, to port is a L shaped leather couch, custom table, to starboard is the main electrical panel, bar area, wet bar with a sink, Uline ice maker and Uline wine cooler. Amidship to starboard in vessel is the dinette with leather seating and a large adjustable table. To port is the galley. Salon features berber carpet, snap in runners, white vinyl overhead, grab rail, custom wood interior, lighting, AC controls, window treatments, and large windows to port, starboard and aft. Forward in vessel to starboard is the crew quarters featuring AC controls, hanging locker, door, hanging locker, lighting, carpet with runner, central vacuum system, washer and dryer combo, upper and lower bunks and white vinyl overhead. To port is the master cabin featuring a queen size walkaround berth, walk in wardrobe closet, custom linens, berber carpet with runner, lighting, small desk, storage, huge tv, Bose stereo system, mirror, overhead hatch and a private head. Private head features a shower, vacuflush toilet, custom counter top and sink, mirror, lighting and overhead hatch. Forward in vessel to starboard is the Guest stateroom which features over under berths, small tv, dvd player, stereo controls, overhead hatch, custom linens, hanging locker, lighting, carpet, carpet runner, wood door and a private head. Private head features a shower, vacuflush toilet, custom counter top and sink, mirror, lighting and overhead hatch. Forward in vessel is the VIP stateroom featuring queen size berth with custom linens, storage, hanging locker, tv, dvd player, carpet, overhead hatch, lighting, door and a private head. Private head features a shower, vacuflush toilet, custom counter top and sink, mirror, lighting and overhead hatch. All interior of vessel is nicely done and in fair to good condition.

**GALLEY**

*DESCRIPTION:* Galley is to port amidship. Galley features Princess 4 burner electric stove, Nova Kool freezer, Sharp Carousel convection oven, Braun trash compactor, twin Uline refrigerators, sink with garbage disposal and drain area, Fisher and Paykel dishwasher and vent system, custom countertop, teak and holly sole and lighting. All in good condition.

## PROPULSION

**MAIN ENGINES**

*TYPE:* 12V Cylinder, Twin Turbocharged Aftercooled Marine Diesel Engine

*MANUFACTURER:* Caterpillar - Model 3412E-TTA

*SERIAL NUMBERS:*

| | | |
|---|---|---|
| Port | - | 9KS00913 |
| Starboard | - | 9KS00914 |

*HORSE POWER:* 1400 hp per side.

*INDICATED HOURS:*

| | | |
|---|---|---|
| Port | - | 1327 |
| Starboard | - | 1324 |

*THROTTLE CONTROLS:* Twin Disc Power Commander Electronic Controls

*EMERGENCY SHUT DOWN:* Controls at helm and FE 200 fire extinguishers

*ENGINE MOUNTS AND BED:* The main engine beds have large longitudinal stringers inboard and outboard.  In conjunction, adjustable motor mounts are bolted to the stringers and are used to adjust the propshaft alignment as well as secure the engines to the hull stringer structure. Well mounted and secure. All in good condition with room for adjustment.

*BILGE BLOWERS:* Operable at time of survey.

*EXHAUST SYSTEM:* All components of the exhaust system inspected by the surveyor at time of survey including manifolds, rubber hoses, exhaust clamps, ss elbows, blankets, mufflers, elbows, supports and FRP tubes were found to be in good condition and well mounted with no signs of of rust, water leakage or exhaust gas leakage. Servicable.

*INSULATION:* Aluminized foam rubber sound deadening insulation was noted in engine room. In serviceable condition.

*PROP SHAFTS:* Stainless composite - 3" diameter.

*ENGINE SYNCHRONIZER:* Synchronization is possible by using the twin disc controls.

*NOTE:* Caterpillar engine displays and alarms. Oil filters are CAT -1R-0716. Two per engine.

*OTHER:* Sleipner Bow thruster on vessel. Controls are at the upper helm station. Breaker for bow thruster is located in the engine room, aft on the port side. Servicable.

**COOLING SYSTEM**

*TYPE:* Closed coolant recovery system with raw water cooled wet exhaust.

*HOSES AND CLAMPS:* Re-enforced rubber hose clamped, well routed and supported where sighted. All appeared in good condition. No rust or corrosion sighted on hose clamps.

*BELTS AND PULLEYS:* Belts are in fair condition.

*SEACOCKS AND STRAINERS:* Raw water seacocks were ball valve type, well mounted to through hulls and were operable. Strainers are SS construction, clean, in good condition and well mounted.

# III. SYSTEMS

## PROPULSION

**TRANSMISSIONS**

*MANUFACTURER:* Twin Disks - Model - MG-5145-A

*DRIVE TYPE:* Reduction gear. Straight drive. Ratio 1.96 - 1

*CONTROLS:* Twin Disc electronic.

*PROP SHAFT:* Stainless composite - 3" diameter.

*PACKING GLAND:* Flange and bolt type packing glands with spray shields. Servicable.

*COOLER:* External engine mounted raw water heat exchangers. Serviceable with no leaks noted.

*SERIAL NUMBERS:*

| | | |
|---|---|---|
| Port | - | 56V327 |
| Starboard | - | 56V328 |

*NOTE:* Engines not started, transmissions not tested.

## FUEL SYSTEM

**MAIN ENGINE(S) FUEL SYSTEM**

*FUEL TYPE:* Diesel. Tanks were visually inspected only.  They are in servicable condition with no signs of leaks and no fuel odors.

*TANK MATERIAL:* (FRP) Fiber reinforced plastic.

*NUMBER OF TANKS:* Two (2)

*TANKS CAPACITY:* Diesel fuel 1100 gallons.

*LOCATION:* Amidship in lower hull under galley.

*FILL PIPE GROUNDED:* Appears to be properly grounded but not tested.

*FILL PIPE MATERIAL:* Type A2 USCG approved hose. Serviceable.

*FILL PIPE FITTINGS:* Fill deck fitting clearly marked as to fuel type. Fittings well secured where sighted.

*HOSE CONNECTIONS, CLAMPS:* Swage type fittings and compression fittings. All tight and secure where inspected.

*FUEL LINES AND FITTINGS:* Grade USCG type A2. Serviceable where sighted.

*RETURN LINES:* Grade USCG type A2. Serviceable where sighted.

*FUEL MANIFOLD VALVES:* Ball type valves properly marked, operable.

*VENT LOCATION:* Port and starboard hullsides.

*SHUT-OFF VALVE:* Ball valves in engine room.

*FUEL FILTERS:* Yes. Both remote mounted Racor filter/water separator type and engine mount spin on/off type. Duel Racor units were plumbed in parallel to facilitate fast easy switch over and maintenance. Cat model 1R-0749

## ELECTRICAL SYSTEMS

**ELECTRICAL SYSTEM (D.C. SYSTEM)**

*BATTERIES:* Eleven batteries, well mounted and secure. Labeled for use.

*MAIN BATTERY SWITCHES:* Five Main Battery switches located in engine room. Well labeled and servicable.

*PANEL:* Large DC panel at flybridge. Large DC panel in engine room. Large panel in salon. All panels well labeled and no signs of overheating were observed.

*BREAKERS/FUSES:* Well labeled and marked. Servicable. No signs of overheating.

*CHARGING SYSTEM (BATTERY CHARGER):* One Newmar RM2020 12vdc charger. One Newmar Phase III PT 24-40 - 24vdc. Operable at time of survey.

*CHARGING SYSTEM (ALTERNATOR):* Alternators on main diesel engines appear to be OEM. Servicable.

**ELECTRICAL SYSTEM (A.C. SYSTEM)**

*SHORE POWER:* Vessel uses a 50 amp / 240 volt system. Power is supplied by a shore power cord hooked to a power pedestal on the dock or generates its own electricity with its generator. Vessel uses a "Cablemaster" shore power cable system. The Main AC breakers are located in the engine room. Secondary breakers are located in the main electrical panel, located in the salon on the starboard side.

*BRANCH BREAKERS:* Branch breakers are well marked and show no signs of overheating.

*POLARITY:* The polarity was checked by myself at all outlets that I could find and proved normal.

*GALVANIC ISOLATOR:* Two (2) Zinc Saver II's sighted in engine room.

---

# III. SYSTEMS

## ELECTRICAL SYSTEMS

**GENERATORS AND INVERTERS**

*   ***TYPE:*** **[B1]** Two generators onboard vessel. One is a Onan MDKAF - 495S098 - Serial number A010202660 - 22KW. with 2774 hours. The secondary generator is a Onan (Smaller - KW ranking not visible due to installation. Believed to be a 7.5 kW) Model - MDKAL - 5551589 with 284 hours. Not started. Operation unknown. Both units have HMI air water separators for the exhaust system.

    ***FUEL FILTER:*** Units each have a small racor fuel/water separator located on the engine room forward bulkhead. Model # - R245 with sight glass. Serviceable. Both units have screw on canister filters. Condition unknown.

    ***EXHAUST SYSTEM:*** Raw water cooled exhaust hose to Aqua lift type FRP (fiber reinforced plastic) muffler to HMI water / air separators. All components are in good condition and secure.

## FRESH WATER SYSTEM

**FRESH WATER SYSTEM:  (POTABLE WATER)**

*   ***DESCRIPTION:*** **[B2]** Large 215 gallon SS water tank located in the lazzerette with two Shurflo 24 vdc pumps, accumulator tank and a small inline strainer. Serviceable.

**FRESH WATER SYSTEM (HOT WATER SYSTEM)**

    ***DESCRIPTION:*** Two 18 gallon "Seaward" hot water heaters located in engine room. Both well mounted and secure. The forward hot water heater is plumbed for heat exchange with the port side motor.

## SANITATION

**SANITATION (BLACK WATER)**

    ***M.S.D TYPE USCG SYSTEM:*** Certification Type: MSD U.S.C.G. Type III. (Holding tank) with macerator and direct discharge capabilities. Sealand Vacuflush system with three toilets onboard. Servicable with no odors or leaks noted.

    ***SYSTEM INSTALLATION:*** Servicable. Discharge seacock should be locked down in closed position while in inshore waters or in no discharge areas.

    ***HOLDING TANK:*** Plastic, estimate 100 gallons. Located in lazzerette. Servicable.

**SANITATION (GREY WATER)**

*   ***DISCHARGE:*** **[B3]** Most sinks onboard vessel discharge overboard. Showers drain to two sumps which use "Whale" gulper pumps for overboard discharge. Servicable. One sump with pump for AC compressors.

## STEERING SYSTEM

**STEERING SYSTEM**

*   ***TYPE:*** **[B4]** Sea Star /Teleflex Hydraulic steering. Rudders well mounted to hull, lines and fittings where examined are in good condition, no signs of leaks or pressure failures noted on hydraulic steering actuator.

    ***PACKING GLAND:*** Vessel uses bearings not packing glands. Serviceable.

## GROUND TACKLE

**GROUND TACKLE**

    ***RODE CONSTRUCTION:*** 85 lb CQR anchor shackled to 230 feet of chain. Unknown if attached to vessel. Nice anchor locker, foot switches at foredeck and controls at helm.

    ***WINDLASS:*** Vertical anchor winch, servicable and well mounted to bow pulpit.

    ***NOTE:*** Surveyor suggests having a spare anchoring system on board and ready to deploy in case of bad weather or an emergency.

# III. SYSTEMS

## ELECTRONICS AND NAVIGATION EQUIPMENT

### ELECTRONICS AND NAVIGATION EQUIPMENT

*ELETRONICS LIST:* Bow thruster joystick
Icom M502 Vhf
Icom IC-M45 Vhf in salon
CD player with tv screen monitor
Camera system for salon, flybridge and engine room
Simrad autopilot #AP22
Two Furuno Nav Net screens with sounder, radar, chartplotter.
Danforth Powerdamp Compass
Twin Disc engine controls.
Riviera alarm panel with lights
Horn
Auto Anchor display
Cat digital engine displays
Kiddie Fire control monitor
Bilge pump controls
Tank monitors
Sanshin HR1012 spot light controls
DC electrical panel
12 vdc outlet

### ELECTRONICS (ENTERTAINMENT)

*STEREO SYSTEM:* Bose Lifestyle stereo system located in master stateroom with speakers. Guest stateroom has stereo controls and speakers. Vessel has speakers thru out and on the foredeck. Vessel has a "Crestron" Remote system to controls audio and visual thru out vessel. Vessel has access to XM radio channels.

*TV/VCR:* Large NEC 50 inch plasma tv in salon with a Sony DVD / CD player and a Sony VHS player. Master stateroom has a 40" Panasonic tv, Bose DVD / CD player, Direct tv sat reciever and speakers. Guest stateroom has a 14" Solarism tv with a Microvision DVD /CD player and stereo controls. VIP stateroom has a 14" Solarism tv with a Dvdvision DVD /CD player.

*NOTE:* Crestron remote control system noted onboard. Seatel SAT tv control panel in salon. Operable.

## THRU-HULLS

### THRU-HULLS:

*NOTE:* All thru hulls inspected by surveyor at time of survey were made of bronze and had seacocks attached. They were all in good condition, operable and well mounted. Hoses leading to the seacocks were in good condition, well mounted and double clamped for safety.

*COMMENTS:* Test often for proper operation.

## BONDING SYSTEM

### BONDING SYSTEM

*MAIN BONDING CONDUCTOR:* The bonding system is well established where sighted. The bonding system uses an individual green insulated wire which connects all metal components in the engine compartment and other components (through hulls, etc) throughout the vessel including the underwater metals to the grounding circuit of the vessel.

## SAFETY EQUIPMENT

### SAFETY EQUIPMENT (UNITED STATES COAST GUARD)

*NUMBER AND TYPE OF PFD'S:* 15 Type II-U.S.C.G. approved.

*NUMBER OF THROWABLE PFD'S:* One (1) Type IV-U.S.C.G. approved throwable device.

＊ *FIRE EXTINGUISHERS:*    [B5] Six hand held BC fire extinguishers noted onboard. One large FM200 clean agent fire extinguisher for engine room noted under the lazzerette.

＊ *VISUAL DISTRESS SIGNALS:*    [B6] Flares were hand held Day/night visual distress signals. Expired Oct 2005

*SOUND DEVICES:* Horn on board vessel is operable.

*NAVIGATION LIGHTS:* All navigation lights were operable at time of survey.

### AUXILIARY SAFETY EQUIPMENT

*LIFE RAFT:* 8 person Avon liferaft noted in cradle on foredeck. Sticker shows recertified in December 2008.

＊ *E.P.I.R.B.:*    [C5] McMurdo Precision 406 GPS Epirb at flybridge.

*SMOKE DETECTOR:* None Sighted.  Highly recommended.

---

# III. SYSTEMS

## SAFETY EQUIPMENT

**AUXILIARY SAFETY EQUIPMENT** *(Continued)*

> *FIRE ALARMS:* Seafire fixed fire extinguisher panel at helm.
>
> *BILGE HIGH WATER ALARM:* Bilge high water alarm was operable at time of survey.
>
> *FIXED FIRE EXTINGUISHING SYSTEM:* Yes, a large FM 200 in engine room with automatic activation.
>
> *SEARCH LIGHT:* Sanshin spotlight mounted on top of vessel.

**BILGE PUMPS**

> *LIST:* Six bilge pumps onboard vessel. All have alarms, lighted manual switches, float switches and are operable at time of survey. They are a combination of Johnson pumps and Rule bilge pumps. One Whale manual bilge pump noted onboard in the starboard locker in cockpit. Operational at time of survey.
>
> *COMMENTS:* Monitor and test frequently the operation of all of the vessels bilge pumps. A safety concern.

## OUT OF WATER INSPECTION

**BELOW WATERLINE MACHINERY**

> *PROPELLER(S):* No out of the water inspection was requested or performed.

## AIR CONDITIONING AND HEAT

**AIR CONDITIONING**

> ✳ *COMMENTS:* **[C6]** A large and extensive Air conditioning system is onboard vessel. Each stateroom, (3) has its on self contained ac unit with digital controls. The salon has a large unit with digital controls. The stateroom units are approximately 10,000 btu's each and the main salon is approximately 30,000 btu's. All ac units use a single 230 volt ac Cruisair pump for cooling water. It is located in the engine room, port side. System ran well and cooled vessel to a pleasant 68 degrees at time of survey. Pull down temperature was measured in the salon and was in the proper range. They are all believed to be cruisair models but due to installation of units, Model or BTU ratings were not discovered.

**HEATING SYSTEM FOR VESSEL**

> *COMMENTS:* Air conditioning units are reverse cycle and provide heat in that mode. Not tested at time of survey.

## SEATRIAL REPORT

**INTRODUCTION**

> *INTRODUCTION:* No sea trial was requested nor performed.

## ENGINE SURVEY SUMMARY

**ENGINE SURVEY**

> *ENGINE SURVEY PERFORMED BY:* No engine survey was requested or performed. Engines not started nor tested.

---

# IV. FINDINGS AND RECOMMENDATIONS

Deficiencies noted under **"SAFETY"** should be addressed before vessel is next underway.  These findings represent an endangerment to personnel and/or the vessel's safe and proper operating condition. ***Findings may also be in violation of U.S.C.G. regulations.***

Deficiencies noted under **"OTHER DEFICIENCIES"** should be corrected in the near future so as to maintain standards and to help the vessel to retain it's value.

Deficiencies will be listed under the appropriate heading:

      A.    SAFETY DEFICIENCIES

      B.    OTHER DEFICIENCIES NEEDING ATTENTION

      C.    SURVEYORS NOTES AND OBSERVATIONS

NO "A" SAFETY DEFICIENCIES WERE NOTED DURING SURVEY.

## B. OTHER DEFICIENCIES NEEDING ATTENTION:

| FINDINGS | RECOMMENDATIONS |
|---|---|
| **B.1 (PAGE 6)**<br>**22kw generator located on the starboard side forward in engine room is low on coolant. Zincs need to be changed in both generators.** | *Top off fluid, monitor condition. Change zincs in generators heat exchangers. Monitor condition.* |
| **B.2 (PAGE 6)**<br>**Fresh water pump operation indicator light, located over the compainonway in salon stays on at all times.** | *Have indicator panel lights checked for proper operation.* |
| **B.3 (PAGE 6)**<br>**Sump with pump for AC compressors, located at the entrance to the engine room in the bilge is inoperable and is flooding the center bilge.** | *Repair or replace sump. Monitor condition.* |
| **B.4 (PAGE 6)**<br>**The hydraulic steering system pressure/reservoir tank shows 17 lbs. pressure on its gauge. Some clamps and fittings for the steering system actuator, located at stern of vessel are rusting.** | *Pressurize tank to 25-35 PSI and add fluid if needed. Monitor condition. Clean up rust on actuator and replace any rusty clamps.* |
| **B.5 (PAGE 7)**<br>**FM200 clean agent fire extinguisher for engine room located under the lazzerette is rusting, sitting in water, gauge shows discharged, controls nearby are not properly mounted and is not properly tagged.** | *Have all fire extinguishers onboard recertified and tagged by proper personal. Remove large FM200 tank and have tested. Re-install above bilge water and have controls for unit properly mounted. A safety concern.* |

# IV. FINDINGS AND RECOMMENDATIONS

## B. OTHER DEFICIENCIES NEEDING ATTENTION:

| FINDINGS | RECOMMENDATIONS |
|---|---|
| **B.6 (PAGE 7)**<br>**Day/night visual distress signals and hand held flares. Out of date.** | *Comply with USCG regulations for Visual Distress Signals. Vessel 40' to 65' are required to carry One orange distress flag or One electric distress light - or - three hand-held or floating orange smoke signals and One electric distress light - or - three combination (day/night)red flares: hand-held, meteor or parachute type.* |

## C. SURVEYOR'S NOTES AND OBSERVATIONS:

| FINDINGS | RECOMMENDATIONS |
|---|---|
| **C.1 (PAGE 3)**<br>**Swim platform has some gelcoat cracking and crazing.** | *Repair damaged areas of swim platform as desired.* |
| **C.2 (PAGE 3)**<br>**Bilges in vessel have some water present.** | *Clean all bilges, monitor condition.* |
| **C.3 (PAGE 3)**<br>**Phone / tv inlet located in starboard side cockpit locker is not properly mounted.** | *Mount inlet properly.* |
| **C.4 (PAGE 4)**<br>**The carpet is stained in the salon next to one of the Uline refrigerators.** | *Have carpet cleaned or replaced.* |
| **C.5 (PAGE 7)**<br>**McMurdo Precision 406 GPS Epirb noted at flybridge.** | *Buyer needs to re-register EPIRB in new owners name.* |
| **C.6 (PAGE 8)**<br>**Air conditioning pump in engine room is too loud when it is operating.** | *Replace pump, monitor condition.* |

# V. SUMMARY AND VALUATION

**STATEMENT OF OVERALL VESSEL RATING OF CONDITION:**
It is the surveyor's experience that develops an opinion of the **OVERALL VESSEL RATING OF CONDITION** after a the survey has been completed and the findings have been organized in a logical manner.

The grading of condition, developed by **BUC RESEARCH**, and accepted in the marine industry, for a vessel at the time of survey, determines the adjustment to the range of base values in the **BUC USED BOAT PRICE GUIDE**, for a similar vessel sold within a given time period, as a consideration to determine the Market Value. BUC is not the only resource used for valuation purposes. At times, other resources are used exclusively.

The following is the accepted marine grading system of condition:

**"EXCELLENT (BRISTOL) CONDITION"**, is a vessel that is maintained in mint or bristol fashion - usually better than factory new - loaded with extras - a rarity.

**"ABOVE AVERAGE CONDITION"**, has had above average care and is equipped with extra electrical and electronic gear.

**"AVERAGE CONDITION"**, ready for sale requiring no additional work and normally equipped for her size.

**"FAIR CONDITION"**, requires usual maintenance to prepare for sale.

**"POOR CONDITION"**, substantial yard work required and devoid of extras.

**"RESTORABLE CONDITION"**, enough of hull and engine exists to restore the boat to usable condition.

As a result of my investigation, as shown in the **SYSTEMS AND FINDINGS AND RECOMMENDATIONS** section of this **REPORT OF SURVEY**, and by virtue of my experience, my opinion is
OVERALL VESSEL RATING:_____**AVERAGE**_____

**STATEMENT OF VALUATION:**
1. The **"FAIR MARKET VALUE"** is the most probable price in terms of money which a vessel should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus.

Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

a. Buyer and seller are typically motivated.

b. Both parties are well informed or well advised, and each acting in what they consider their own best interest.

c. A reasonable time is allowed for exposure in the open market.

d. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

e. The price represents a normal consideration for the vessel sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Therefore, after consideration of the reliability of the data, the extent of the necessary adjustments and condition of the vessel, it is your surveyor's opinion that the **"FAIR MARKET VALUE"** of the subject vessel is:
$1,000,000.00
*one Thousand Dollars and Eigh cents*

2. The **"ESTIMATED REPLACEMENT COST"** indicates the retail cost of a new vessel of the same make/model with similar equipment offered by the same or similar manufacturer. **"ESTIMATED REPLACEMENT COST"** of the subject vessel is:
$2,000,000.00
*Two Million Dollars and Zero cents*

# V. SUMMARY AND VALUATION

**SUMMARY:**
In accordance with the request for a Insurance Condition and Value Survey of the "All Axcess" , for the purpose of evaluating its present condition and estimating its Fair Market Value and replacement Cost, I herewith submit my conclusion based on the preceding report. The subject vessel was personally inspected by the undersigned on **3/19/08** and was found to be a well constructed, appointed and comfortable vessel.  Subject to correction of deficiencies listed in section IV A. (Safety), **the vessel is considered to be suitable for its intended use.**  Other deficiencies list should be attended to in a timely fashion.

**SURVEYOR'S CERTIFICATION:**
I certify that, to the best of my knowledge and belief:

The statements of fact contained in this report are true and correct.

The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions, and conclusions.

I have no present or prospective interest in the vessel that is the subject of this report, and I have no personal interest or bias with respect to the parties involved.

My compensation is not contingent upon the reporting of a predetermined value or direction in value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulate result, or the occurrence of a subsequent event.

I have made a personal inspection of the vessel that is the subject of this report.

All conditions may not be found at time of survey and this is a general survey only and a limited report. Based on the manner of presentation of the vessel there may be latent conditions discoverable at a later date. All statements and comments in the report are opinions only  and no statement shall be the basis for any claim against the surveyor based on warranty, guarantee, or negligence".

This report is submitted without prejudice and for the benefit of whom it may concern.



ATTENDING SURVEYOR:  Validity unknown

Digitally signed by Ned R. Hickel
DN: cn=Ned R. Hickel, o=Gale Force Surveys, ou=Society of Accredited Marine Surveyors, c=US
Date: 2008.03.19 17:10:02 -05'00'

Ned R Hickel  AMS  Society of Accredited Marine Surveyors



# LEWIS TEIN PL
### ATTORNEYS AT LAW

March 25, 2008

Nevin Shapiro
c/o Marc Levinson, Esq.
Shook Hardy & Bacon, LLP
201 S. Biscayne Boulevard
Miami, Florida 33132

*via email: mlevinson@shb.com*

Re:  Purchase of Riviera 58

Dear Nevin:

As this firm represents you in an ongoing separate matter, we are required to make
certain disclosures to you regarding the purchase of your Riviera boat in order to
ensure that your interests are protected.

Because of the potential for conflict of interest with regard to any transaction
between lawyer and client, Florida Rule of Professional Conduct 4-1.8(a) requires
us to inform you that you have the right to understand the terms of this agreement,
to verify that the terms of the agreement are fair and reasonable, and to seek the
advice of independent counsel regarding this transaction. We understand that you
have offered the boat to us for sale; that as part of our purchase payment, you will
receive a credit against $200,000 in legal fees due in the other matter; that you
have sought the advice of Marc Levinson, Esq. regarding the terms of this
transaction; that Marc is drafting the written contract for sale in consultation with
you, and that Marc is representing your interests in this transaction.

Of course we will continue to represent you vigorously on the other matter, which
is ongoing.

Capitol/SHB001218

EXHIBIT
4

Nevin Shapiro
Mar. 25, 2008
Page 2

LEWIS TEIN PL
ATTORNEYS AT LAW

If you have any questions about this disclosure or the nature of the boat sale, please do not hesitate to ask us or Marc. If not, please sign the letter and return it to us. We remain, with kindest regards,

Very truly yours,

Michael R. Tein
LEWIS TEIN, P.L.

Pursuant to Florida Bar Rule 4-1.8(a), I accept the foregoing:

NEVIN SHAPIRO

DATE: 3-26-08

Capitol/SHB001219



① 

**Bank of America** 💲     Cashier's Check     No. 5194035

Date: APRIL 09, 2008

Pay    **\*\*TWO HUNDRED THOUSAND DOLLARS AND 00 CENTS\*\***

To The Order Of    **\*\*PROVIDENT BANK\*\*** ****

Remitter (Purchased By): KEVIN L. SHAPIRO / GUT LIMIT$

$ **\*\*200000.00\*\***

Authorized Signature

Banking Center    ARTHUR GODFREY

0109387  30004  005194035

Bank of America, N.A.
San Antonio, Texas    VOID AFTER 90 DAYS

09-14-3726B 09-2005

⑈5194035⑈ ⑈114000014⑈  0016410020624⑈

■ THE ORIGINAL DOCUMENT HAS REFLECTIVE WATERMARK ON THE BACK

---

② 

**Bank of America** 💲     Cashier's Check     No. 5194036

Date: APRIL 09, 2008

Pay    **\*\*ONE HUNDRED SEVEN THOUSAND FIVE HUNDRED THIRTY SIX DOLLARS AND 00 CENTS\*\***

To The Order Of    **\*\*PROVIDENT BANK\*\*** ****

Remitter (Purchased By): KEVIN SHAPIRO

$ **\*\*107536.00\*\***

Authorized Signature

Banking Center    ARTHUR GODFREY

0109387  30004  005194036

Bank of America, N.A.
San Antonio, Texas    VOID AFTER 90 DAYS

09-14-3726B 09-2005

⑈5194036⑈ ⑈114000014⑈  0016410020624⑈

■ THE ORIGINAL DOCUMENT HAS REFLECTIVE WATERMARK ON THE BACK

Capitol/Shapiro020451

**EXHIBIT 5**

## CLOSING STATEMENT
### 2003 61.0' (Reg. Length) Riviera Yacht, Hull ID #RJH58002D203
### ALL AXCESS, Official Number 1139800
Date: *April 10, 2008*

**Seller:**    Nevin Shapiro
          4045 Sheridan Avenue, #373
          Miami Beach, FL 33140

**Buyer:**    LT Nautical, LLC
          3059 Grand Avenue, Suite 340
          Coconut Grove, FL 33133

Purchase Price.................................................................................$850,000.00

Sales Tax.....................................................................................51,050.00*

                        TOTAL DUE................$901,050.00

*Buyer's check made payable to Florida Department of Revenue

Payoff Due Provident Bank...........................................................$957,536.00

Buyer's Loan Proceeds...............................................................650,000.00**

Buyer's Proceeds......................................................................200,000.00*** ①

**Payable to Provident Bank
***Payable to Provident Bank . Note: Shapiro to pay this amount at close, which amount represents unpaid balance of outstanding legal fees owed to Lewis Tein, P.L.

             BALANCE DUE LOAN PAYOFF...........107,536.00**** ②

****Payable to Provident Bank by Seller Nevin Shapiro's Cashier Check

Miscellaneous expenses to be paid by Buyer LT Nautical, LLC (Guy Lewis – Michael Tein)

Bank cost..............././...............$2,434.75 (cashier's check payable to Great Florida Bank)
Carol M. Berndt & Assoc.Inc......$1,056.00 (check payable to Carol M. Berndt & Assoc.)

_____          _____
Seller's Signature                          Buyer's Signature

**Capitol/Shapiro020450**

EXHIBIT
**6**